No. 88,347

STATE OF KANSAS, *Appellee,* v. JAMI DEL SWANIGAN, *Appellant.*
106 P.3d 39

Opinion filed February 18, 2005.

*Debra J. Wilson,* capital appellate defender, argued the cause and was on the brief for appellant.

*Bobby J. Hiebert, Jr.,* assistant county attorney, argued the cause, and *Ellen Mitchell,* county attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Jami Del Swanigan was convicted by a jury of aggravated robbery. In a split decision, the Court of Appeals affirmed the conviction. *State v. Swanigan*, No. 88,347, unpublished opinion filed December 19, 2003. We granted Swanigan's petition for review pursuant to K.S.A. 20-3018(b).

Swanigan now raises two issues on appeal:

(1) Did the trial court err in denying his motion to suppress statements he made during police interrogations?

(2) Did the trial court err by failing to give a jury instruction regarding the voluntariness and truth of Swanigan's statements?

We reverse the conviction and remand for a new trial because of error on issue one, which makes the second issue moot.

## FACTS

Shortly before 4 a.m. on October 26, 2000, the Kwik Shop on West Cloud Street in Salina was robbed. According to clerk Krystal Keefer, she saw a black man put his hand up to the glass of the front window and look inside. He then rushed in the front door with a gun. Several times the robber told her to hurry and at one point told her that he would shoot her or kill her if she did not go faster. She opened the cash drawer, grabbed the bills, and handed them to the robber. As she began to grab the change, the robber turned and ran out the front door to the east. The robber stole $100 to $102.

Beverly Rindt saw a small compact car that was white, gray, or silver in color pull up behind her van. After she was done bagging newspapers in her van, she turned to go to the Kwik Shop and saw a man leave the shop and run east toward the car. Eric Harper also saw a little white car and a Ford Ranger in the area at that time.

Surveillance cameras at the Kwik Shop captured video images of the robber. The man was wearing a blue bandana over his nose and mouth, blue denim shorts, a long-sleeved black or blue shirt, tennis shoes, and white socks. A photograph of the robber taken from the video was posted at the police station, and Lieutenant Christopher Trocheck believed the person shown to be Jami Swanigan.

Five days after the robbery, Shari Lanham, the lead investigator, accompanied another officer to Jessica Wegele's house, where Swanigan was staying. Lanham asked Swanigan if he would come to the police department to answer questions about this robbery and other recent convenience store robberies in Salina. He agreed and rode in a patrol car to the station. Upon his arrival, he was placed in a locked waiting room for 30 to 45 minutes before the interrogation began.

The interrogation lasted from 5:03 p.m. until 6:20 p.m., with all but the first few minutes recorded on audiotape. When it began, Lanham read Swanigan his *Miranda* rights, which Swanigan indicated he understood. Swanigan first denied knowing anything about the robberies, but eventually said he had heard Marcus

Brown was involved. Lanham falsely told Swanigan that his finger-prints had been found at the scene. She also informed him that he had been caught on the surveillance camera. Swanigan had no explanation for either fact, except that he had possibly been at the store before.

After Swanigan took a bathroom break, Lieutenant Mike Sweeney, who was in charge of criminal investigations and who supervised Lanham, joined the interrogation. Swanigan gave Sweeney and Lanham several different stories, but each version contained facts that were contrary to what the officers knew from the eyewitnesses. When confronted with the discrepancies, Swanigan then denied any involvement in the robbery.

Investigator James Feldman then joined the interrogation. Right after Feldman's comments, Swanigan confessed to the robbery. When a discrepancy arose over the clothes the robber had worn, Feldman showed Swanigan a photo from the surveillance video. Swanigan immediately denied the photo was of him and denied that he had any involvement in the robbery. Based primarily upon his interrogation — since latent fingerprints taken from the store, including the front window, were found not to be his — he was arrested and charged with aggravated robbery. Swanigan also gave the police an oral statement the next day, November 1, in which he again not only confessed to the robbery, but also then began providing facts that the officers knew were untrue, so they ended the interrogation.

On January 5, 2001, Swanigan filed a motion to suppress his two statements. At the February 23, 2001, suppression hearing, the trial court denied the motion. The State introduced information from the statements into evidence at the jury trial where Swanigan was convicted of aggravated robbery. Based upon Swanigan's criminal history classification, the court sentenced him to 88 months in prison.

## ANALYSIS

Issue 1: *Did the trial court err in denying Swanigan's motion to suppress?*

## Voluntariness Determination

In Swanigan's motion to suppress, he alleged that his statements were not voluntary, knowing, or intelligent under the totality of the circumstances. Specifically, Swanigan alleged that the police used coercive and deceptive tactics, including providing him false information that his fingerprints matched those found at the crime scene and promising that his cooperation in the investigation would help him.

At the hearing, Lieutenant Sweeney and investigators Lanham and Feldman testified, as did Dr. Robert Schulman, a clinical psychologist who had evaluated Swanigan for the defense. Admitted into evidence was a photograph of the robber taken from the surveillance video, Dr. Schulman's report, and an audiotape of the October 31 police interrogation to which the trial court later listened. In later denying the motion, the judge stated:

"Well, here's what I have to decide. I have to decide, regarding the voluntariness of statements, whether the State has proved by a preponderance of the evidence, considering the totality of the circumstances, whether Mr. Swanigan's statements were freely and voluntarily made. There's no question he was advised of his *Miranda* warnings. That's not an issue. He was. The Court listened to the tape. There were some allegations that Mr. Swanigan was misled by some of the officers indicating that they'd found fingerprints when, in fact, they had not, or at least that his matched fingerprints found when they were not. There was also the suggestion that, Mr. Swanigan, that your physical and psychological state was such that your will was overcome by police tactics. There was also an allegation made that you were promised leniency.

"I've listened — I listened to the evidence on Friday. I listened to the tape. It is my thought that, considering the totality of the circumstances, the Court concludes that the State has proved by a preponderance of the evidence the statements should be admissible into evidence. *Miranda* warnings were given. Now, police interrogation is never pleasant. There's always, by the very nature of the police atmosphere, some coercive circumstances or atmosphere. That's the reason the *Miranda* warnings are given. They recognized that in *Miranda* that at least a subject should be told that they have a right to remain silent. Now, Mr. Swanigan could have exercised his right to remain silent any time. He could have asked for counsel. He did not.

"I listened to the officers on the tape, and I listened to them testify. There's no way in the world that anyone could conclude after listening to that tape that Officer Shari Lanham exercised undue coercion on Mr. Swanigan. At no time were voices raised. At no time were any threats uttered. On the whole, it seemed

to be a pretty level interrogation. It lasted just a little over an hour. There were breaks taken. I can't see in these particular circumstances how anyone could look at that circumstance and say that Mr. Swanigan wasn't treated humanely. He was. I don't see any indication of out-of-bounds conduct by the police.

"Now, as far as the promises made, Mr. Swanigan was told several times that if he cooperated that that would be conveyed to anybody who might pursue the case. No specific promises of leniency were made. As a matter of fact, several times, the Court heard on the tape that Lieutenant Sweeney indicated that there couldn't be any promises made by those in authority. So, I think the conduct of the police is within bounds, and that's my decision on that.

. . . .

"I did — I failed to mention that at the hearing the defendant called an expert witness, Dr. Robert Schulman, Ph.D., licensed clinical psychologist. In his report, in his testimony, he indicated that the clinical examination of Mr. Swanigan was within normal limits. He also concluded there's no indication of any underlying associative thought disorder. . . . The overall cognitive functioning, while low, is generally intact.

"It would seem to me that — the Court considered that testimony. I found nothing there that would lead me to believe that Mr. Swanigan was of such a psychological state that it was improper for the police to interrogate and talk to him. And, by the way, there's no allegation the police induced to cause that psychological state. And, for all of these reasons, the Court believes simply that the State has proved by preponderance of the evidence that the statements of Mr. Swanigan on October 31st of the year 2000, and the next day, follow-up, should be admitted into evidence."

Our standard of review of the trial court's findings of fact and conclusions of law is well-known:

"In reviewing a district court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. [Citation omitted.] This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]" *State v. Mays*, 277 Kan. 359, 372, 85 P.3d 1208 (2004).

We stated additional considerations specifically concerning confessions in *State v. Sanders*, 272 Kan. 445, 452, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002):

"' "In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused

on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused." ' " (quoting *State v. Baston*, 261 Kan. 100, 105, 928 P.2d 79 [1966]).

Similar to his position at the suppression hearing, Swanigan argues on appeal that his confession was involuntary, *i.e.*, his will was overborne by the interrogators, primarily because of two of the specific circumstances identified in *Sanders*. First, he claims low intellect. Second, he claims the interrogating officers were unfair. In particular, he argues they lied that his fingerprints were found at the Kwik Shop. He also argues the officers were unfair because they told him that his cooperation, or lack thereof, would determine whether he was dealt with gently or harshly. According to Swanigan, if he failed to confess to the October 26 robbery, he not only could be charged in five convenience store robberies but also, upon the officers' recommendation, he would receive harsh treatment from the county attorney. In addition to *Sanders*, he cites an evidentiary statute, K.S.A. 2004 Supp. 60-460(f)(2)(B) (statement inadmissible when suspect induced to make it "by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same").

Under our standard of review, we first examine the evidence at the suppression hearing to determine if it is competent and substantial enough to support the trial court's findings. We begin with the fingerprints. The trial court stated: "There were some allegations that Mr. Swanigan was misled by some of the officers indicating that they'd found fingerprints when, in fact, they had not, or at least that his matched fingerprints found when they were not." However, outside of this statement, and a declaration that "the totality of the circumstances" were considered, it is unclear whether the court found the deception was actually performed by the officers or was merely alleged by Swanigan. As the following record excerpts reveal, the evidence clearly demonstrates the deception was performed.

When Lanham challenged Swanigan's assertion that he did not know anything else about the robberies, the following occurred:

"[Lanham:] Okay. I don't think you're being honest, Jami. As a matter of fact I know you're not being honest. You know how I know?
"[Swanigan]: How?
"[Lanham]: The lieutenant just told me that we have your fingerprints at the robbery. So you need to get it straight . . . ."

When asked at the suppression hearing why she told Swanigan his fingerprints were found at the scene, Lanham answered, "I suppose I said it so he would think that his fingerprints were there." When asked why she would want him to think that, Lanham replied, "So he would give me an admission."

The evidence is virtually undisputed that the officers repeated the fingerprint deception throughout the interrogation. Lieutenant Sweeney told Swanigan:

"Explain to me, I want you to give me a good reason why your fingerprints are on that window over there. I can't explain that why. That's one thing you cannot dispute. Have you heard about the forensics of fingerprints?

. . . .

"If I put my fingerprint right there, there isn't another person in the world that can prove that that would be the same fingerprint. So you go ahead and explain to me how your fingerprints got right there at that one exact spot where the clerk pointed out where you sat there and looked in the window.

. . . .

". . . I know you been there 'cause your fingerprint is on that window."

Later, when Swanigan said his fingerprint was there because he went to the store one day and put his hand on the window to see what was in the store, Sweeney replied:

"No. Because they pointed exactly where this was. There's only one spot that had fingerprints on. She goes, 'He looked through that window right there.' We look at the window, there's fingerprints on it. We dust the fingerprint. We compare it. Your name got brought up, we look at the picture. Yes, that is Jami. We go, we compare the fingerprint. It's Jami Swanigan. So what else do we need to do now?"

We next consider evidence at the suppression hearing concerning the officers' alleged promises, threats, or both. Regarding promises, the trial court found that "Swanigan was told several times that if he cooperated that that would be conveyed to anybody

who might pursue the case." The court further found that although "[t]here was . . . an allegation made that you were promised leniency," that "[n]o specific promises of leniency were made," and that several times "Lieutenant Sweeney indicated that there couldn't be any promises made by those in authority." As shown below, substantial competent evidence supports these trial court findings.

Regarding threats, the trial court found: "At no time were any threats uttered." We agree no express threats were uttered, but find that evidence of implied threats exists on the audiotape. The implicit threats are occasionally intertwined with the officers' urgings that Swanigan cooperate. Examples from both categories of interrogation techniques are italicized below:

"[Lanham:] So you need to come clean. You know what's gonna happen after I get done talking with you Jami. I've gotta do a report. Right? You know that. That's all we do here is reports. *And I need to go and put in my report that Jami cooperated. I need to be able to tell Parrish that you, that you cooperated with me and that you came clean and that you got it straight. And that you weren't involved in all of them because you know what Jami? I don't think you're involved in all of them. I think you had a small part in one of them, and that's what I want from you. That's what we need to know from you so that you don't go down for all these robberies. We just want to know your involvement in yours. That's all we want to know from you, so that you don't get charged with all of them.* 'Cause I honestly don't think you're involved in all of them, Jami. And if these guys [apparently robbery suspects in an adjoining room] are saying that, I don't think that's right for you.

. . . .

"*And if you come clean with me about your involvement, in whichever robbery it was, then that's gonna help you out a lot when it comes to court time. Because I can put it in my report that Jami cooperated with me,* he understood what the circumstances were but he still told me the truth." (Emphasis added.)

Later in the interview Lanham said: "I just need you to tell me how you was involved. Jami, you know it's the right thing to do. *It's gonna help you in the long run and you know it. 'Cause I guarantee there's a lot of difference between going to jail for five robberies than there is for one.*" (Emphasis added.)

When Sweeney asked Swanigan whether the county attorney knew him, Swanigan said yes, from car robberies in which he had been involved. Sweeney responded:

"[Sweeney:] Okay, but also, um, we're also, you know they've [county attorney's office] got several cases going through at one time, I mean, they uh, they come and go *so what they have to do is base their opinion on what should they do on the reports that we write.*

. . . .

". . . If you're willing to get it straightened out and tell it to me it was the other people involved or what you know, or *maybe we can wheel and deal or whatever I don't know. I can't promise you anything.* But what I'm trying to do is get the truth first.

. . . .

"So what do we need to do now? What we need to do is for Jami to start telling us the truth. Telling us what happened. Because we got Jami coming in, with a gun, robbing the place. We got it on film too.

"[Swanigan:] That's what . . . I don't know. I don't know what it is.

"[Sweeney:] *Okay. Jami, we're going to charge you with aggravated robbery. We're gonna show that you're not cooperating with us.*

. . . .

"What I'm saying is that *we can write the report where it shows that you're willing to get this straightened out, tell the complete truth.*

"We're asking you do that please.

"*If you don't want to . . . Don't mess with him any further. Just throw him in jail for aggravated robbery.*

"[Swanigan:] I do not want to go to jail. I do not want to go to jail." (Emphasis added.)

## Investigator Lanham also told Swanigan:

"I know you been listening to this room [presumably the adjoining room containing another suspect]. *We have him gettin' it straight. He's in there cooperating. He's gonna help them find the evidence. And you know what? That's gonna help him in the long run. Absolutely is gonna help him in the long run. Because that investigator is gonna write his report and he's gonna say this person cooperated with me. He told me the story, he told me how it went down, he even showed me where the evidence was. And you know what? That is gonna help him. And this ain't gonna help you, what's going on in here, Jami.*" (Emphasis added.)

## Finally, after Sweeney departed and Investigator Feldman entered the room, he told Swanigan:

"Jami, the best thing you can do right now . . . *You're going to jail. It's guaranteed. You are going to jail. You got one of two options. You can sit there and B.S. and act like we're, we're idiots and tell these lame stories and we'll write every word you say down and send it over to the county attorney and you'll have every lawyer reading that going, 'Jesus Christ, this is bullshit!' And you know what they're [county attorney] gonna say? Well, when your lawyer comes up and goes, 'Hey, can we get a deal?' You know what they're gonna say? 'Read the report.*

*He, he played games the whole time. He doesn't deserve a break. He hasn't learned from any of the mistakes he made.' Or you can go down and you can say, 'Here's what I did. I fucked up. I'm sorry about it. This is what happened. This is what I did. This is what I know.' And you know what they're [county attorney] gonna say? 'Maybe he's learning. Maybe he's becoming an adult. Maybe he deserves a chance.' But you're not gonna have that chance if you start B.S.ing and continue to play these stupid games.* Why do you think you're down here Jami? We know you did it. We've got pictures. You're in those pictures . . . . Don't play games, you're screwed. It's . . . Jami, you're gonna have to learn, one time. You've gotta take responsibility for your actions. *You can sit here and play your games all you want and you know where it's gonna end up. You're gonna end up back in prison. You've got one of two choices. Be a man and take responsibility and say, 'Hey, I'm sorry. I screwed up. I got in a bad spot. I needed some money. I needed whatever. But I made a mistake. I'm sorry about that.'* Or you can say, 'I just stood outside and watched. I wouldn't do anything like that.' That's bullshit. What's it gonna be Jami? The ball's in your court. You already know you're going to jail.

"*You can show that you made a mistake and you want to take responsibility for your actions and you apologize for it. Or you sit there and play stupid. And then you're gonna fry. Because when the county attorney comes to Sweeney or Lanham and goes, 'What do you think? Here's the deal [plea bargain] that I'm being offered.' You know what we're gonna say if you're playing games? 'Screw ya.'*" (Emphasis added.)

Lanham then told Swanigan, "And if you don't think they [county attorney] ask our opinion you're crazy cause they do."

Immediately after these comments by officers Feldman and Lanham, the following exchange occurred:

"[Swanigan:] "Everything happened so fast. I was standing up at the window. I looked in, put my hand up on the window and looked in. I walked inside the store with a gun in my hand. And I pointed it at the um, clerk and asked, and tell him give me all your money. And he tried, you know, I kept on ___(unintelligible)___. I got real mad and said, 'Give me your money or I'll kill you.' So he finally gave me the money. I got out, ran, and jumped into a car and took off back to Marisha's house and we bought beer and all other things with that money and now that money has disappeared.

"F: How much did you get?

"S: About a hundred and something.

"L: Were you by yourself?

"S: Yes.

"F: Whose car?

"S: It was, um, ___(unintelligible)___ Marisha's car.

. . . .

"F: What kind of car is that?
"S: It's a, um, it's a Cavalier.
"F: What color?
"S: Dark blue.
"L: Where'd you park at?
"S: On the side of the street.
"L: What street, do you know?
"S: That street right beside Tally Ho [trailer park]. I'm like, I'm like . . .
"F: Okay. Here's, here's Kwik Shop, this is Kwik Shop, and these are, that's the one street and that's the one street over here, that's the trailer park, that's the trailer park.
"S: That's where I was at, the trailer park.
"F: Point out where.
"S: On this side.
"F: Okay. How did you come up with this idea?
"S: Because I needed, I needed some money. And I was dead broke.
"L: Where'd you get that gun?
"S: I got the gun from Marcus.
"L: Where's it at now?
"S: I don't know.
"F: What'd you do after the robbery with it?
"S: I gave it back to him.
"F: What kind of gun was it?
"S: It was like a um, .38, something like that.
"F: Semi-automatic, revolver or what?
"S: I think it was a revolver.
"F: Okay. Was it loaded?
"S: No, it wasn't.
"F: *What were you wearing?*
"S: *I was wearing, I was wearing tan pants and, um, tan shirt that's over at Jessica's house.*
"F: Over at Jessica's house? Where at Jessica's house?
"S: On Duvall.
"F: Where, where at?
"S: 676 Duvall.
"L: *So that outfit that you have on, the other one. There's another outfit there just like this one you have on, right? That what you were wearing?*
"S: *Yeah.*
"L: *Really.*" (Emphasis added.)

In an apparent attempt to wrap up Swanigan's confession, Feldman produced a photograph of the robber from the surveillance video and asked, "That you?" Swanigan vehemently denied it:

"Hell no! I can tell you that's not me. I can tell you that's not me." Among other things, Swanigan pointed out that the figure in the photograph was not wearing tan pants and a tan shirt, contrary to what he had just confessed.

From that point until the interrogation ended, Swanigan denied that he was involved in the robbery. When Lanham asked Swanigan how he would therefore know exactly how the robbery happened, he replied, "Because you guys done gave me tips behind how it done happened." When Lanham asked why he would make up the story that he committed the robbery when he actually had not, Swanigan responded, "Because you guys are forcing me to do this." When she denied forcing him into saying anything, he said, "When I try to tell you the truth you guys say it's me."

We next consider evidence at the suppression hearing concerning Swanigan's intellect and psychological state. The trial court found:

"In his report, in his testimony, [Dr. Schulman] indicated that the clinical examination of Mr. Swanigan was within normal limits. He also concluded there's no indication of any underlying associative thought disorder. . . . The overall cognitive functioning, while low, is generally intact.

". . . [T]he court considered that testimony. I found nothing there that would lead me to believe that Mr. Swanigan was of such a psychological state that it was improper for the police to interrogate and talk to him."

While substantial competent evidence exists in the record to support these findings, the finding about Swanigan's "psychological state" incorrectly frames the issue as dispositive, *i.e.*, whether the police can or cannot interrogate him. Here, the issue instead is whether his psychological state, *e.g.*, susceptibility to being overborne by anxiety during the allowable interrogation, was considered as one of the factors in the totality of circumstances for determining the voluntariness of the confession. Similarly, the trial court's findings also seemingly fail to address the particular impact of Swanigan's intellect — an IQ of 76 — during the allowable interrogation. While this court does not reweigh evidence when reviewing trial court findings, neither can a key factor such as a low IQ be ignored when considering the totality of the circumstances.

Dr. Schulman's report on Swanigan was reviewed by the trial court, and in a section titled "examination findings" it states:

"*Estimated intellectual functioning is in the borderline range of intellectual abilities with an estimated IQ of 76.* He says that he missed a lot of school, that he was in regular classes and did not enjoy going to high school. *The clinical examination is essentially within normal limits.* He shows some mild depression. *He also shows difficulty in dealing with anxiety and is susceptible to being overcome by anxiety but in this setting he shows good control.* There are no indications of any underlying associative thought disturbance.

. . . .

"*Overall cognitive functioning while low is generally intact and in keeping with lack of interest in school and lack of interest in academics. Susceptibility to anxiety will reduce judgment in settings where anxiety is created.*" (Emphasis added.)

Under a section titled "explanatory formulation," Dr. Schulman concluded in his report:

"This is a man who does not like to be seen as being incompetent, is able to give the appearance of understanding and functioning at a level better than in fact he is capable of doing, and *while in a custodial setting with law enforcement officers is likely not only to feel anxiety but irritability and anger and make statements that may not be in his best interest and may not be true. This would be particularly true if he believed that the officers were being less than trueful [sic] and wanting to pressure him in a particular way.*" (Emphasis added.)

Schulman confirmed at the hearing that Swanigan had some difficulty in managing anxiety and showed the potential to be overcome by it. Accordingly, the record establishes not only that Swanigan's estimated IQ is 76, but also that he has some tendency to be anxious in custodial settings and has difficulty in dealing with anxiety to the extent he is susceptible to being overcome by it.

With the facts behind us, we now independently determine the conclusion of law: whether Swanigan's statements were voluntary. As noted, this requires an examination of the "totality of the circumstances." *State v. Sanders*, 272 Kan. 445, 452, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002). The ones at issue in the instant case are unfairness (lies, promises, and threats), low intellect, and anxiety in custodial settings.

*Unfairness as a circumstance*

Swanigan first argues that as a police tactic to overbear his will and extract a confession, the officers repeatedly confronted him

with the false information that his fingerprints were found at the scene of the crime.

In *State v. Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), this court considered whether the defendant's statements were coerced when officers falsely represented that they had information and evidence implicating him in a murder. The district court found that although the detective lied in saying the defendant's fingerprints were upstairs, these were bluffs successfully used to convince him to make certain statements in response.

In *Wakefield*, we observed that in *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), the United States Supreme Court held that a questioning officer's false statement to the defendant that the defendant's cousin had been brought in and confessed, when viewed as part of the totality of the circumstances, was insufficient to make the otherwise voluntary confession inadmissible. 267 Kan. at 128. Accordingly, we concluded, after reviewing the totality of the circumstances, that fingerprint misrepresentations to defendant Wakefield during the law enforcement interviews did not alone make his confession involuntary.

Accordingly, under *Wakefield* Salina police were free to lie about evidence that fingerprints were found at the Kwik Shop and confirmed to be Swanigan's. However, also under *Wakefield*, the false information must be viewed as a circumstance in conjunction with others, *e.g.*, additional police interrogation tactics.

The second unfair tactic Swanigan argues the police used to overbear his will was their repeatedly telling him that he would be helping or hurting himself by what he told them. According to him, they urged him to confess to the crime so that they could report that he had cooperated. He claims that when he told them he did not commit the crime, they threatened to report that he was not cooperating, occasionally suggesting that he would be charged with more robberies if he did not confess. At the time, Swanigan was on probation.

The audiotape of the interview, which is excerpted earlier in the opinion, supports Swanigan's arguments. Investigator Lanham mentioned the other robberies and the need for Swanigan's cooperation, adding she "needed" to put in her report that he co-

operated. She thought he had a small part in one of the robberies, "and that's what I want from you. That's what we need to know from you so that you don't go down for all these robberies." She repeats, "We just want to know your involvement in yours. That's all we want to know from you, so that you don't get charged with all of them." She later elaborates upon this incentive to confess: "I guarantee there's a lot of difference between going to jail for five robberies than there is for one."

Sweeney repeated the need for police to show that Swanigan had cooperated and indicated what would happen if Swanigan did not. "[W]e can write the report where it shows that you're willing to get this straightened out" and, if not, "Jami, we're going to charge you with aggravated robbery. We're gonna show [the county attorney] that you're not cooperating with us." Finally, "If you don't want to [cooperate] . . . [j]ust throw him in jail for aggravated robbery."

Like Lanham and Sweeney, Feldman suggested positive consequences for Swanigan admitting his mistake, *i.e.*, confessing to the robbery, but suggested negative consequences if he did not so "cooperate." He specifically mentioned the influence the interrogators have with the county attorney's office, including what they write in their report. Feldman informed Swanigan that if he continued to tell these "lame stories" that when his lawyer asks for a "deal," the county attorney will show Swanigan's lawyer Feldman's report and reject any deal for leniency, *i.e.*, "[h]e doesn't deserve a break." Feldman went on to tell Swanigan that if Swanigan continued to "sit there and play stupid" that "then you're gonna fry." Swanigan would fry because when the county attorney asked the police interrogators if she should accept the deal offered by Swanigan's counsel, they would say, "Screw ya." Lanham then reinforced Feldman by informing Swanigan that the county attorney certainly does ask the police officers for their opinions on "deals."

This court has held that, without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary. *State v. Banks*, 260 Kan. 918, 924, 927 P.2d 456 (1996) ("it will be noted by the authorities that you did cooperate"); *State v. Johnson*, 253 Kan. 75,

82, 853 P.2d 34 (1993) (law enforcement officer stated he would go to the district attorney and tell him if the person was cooperating); *State v. Harwick*, 220 Kan. 572, 575-76, 552 P.2d 987 (1976). Likewise, we have declined to find a confession involuntary when the police encourage the accused to tell the truth. *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Tillery*, 227 Kan. 342, 344, 606 P.2d 1031 (1980); *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900) ("mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent").

Kansas appellate courts, however, have not addressed the other side "of the same coin," *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994), *i.e.*, law enforcement conveying a suspect's *lack* of cooperation to the prosecutor. A growing number of courts have disapproved this tactic. Those not finding that it is coercive per se regard it as another circumstance to be considered in determining the voluntariness of the confession.

In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit Court of Appeals, like Kansas courts, acknowledged that an interrogating officer's representation to a suspect that his cooperation will be made known to the prosecutor, standing alone, does not necessarily render a subsequent confession involuntary. It was one of a series of representations made, and the court considered the cumulative effect of the statements in order to determine whether the confession was voluntary. 658 F.2d at 1336 n.4.

The *Tingle* court, however, particularly disapproved of an interrogating officer's representation that the defendant's failure to cooperate will be communicated to a prosecutor. It stated:

"Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations." 658 F.2d at 1336 n.5.

See also *United States v. Harrison*, 34 F.3d at 891-92 ("[T]here are *no* circumstances in which law enforcement officers may suggest

that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor."); *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 n.2 (9th Cir. 1988) ("[T]hreatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent."); *Ex parte Mathews,* 601 So. 2d 52 (Ala. 1992) (investigator's statements engineered and encouraged defendant to think that he would be more favorably dealt with if he would confess, *e.g.,* "I can go back and tell the district attorney [that you] cooperated with me, or I can go back and tell the district attorney that [you] did not cooperate with me"); *Beavers v. State,* 998 P.2d 1040, 1045-46 (Alaska 2000); *State v. Blakley,* 204 Ariz. 429, 436, 65 P.3d 77 (2003) ("most worrisome part of this interview was Detective Siebrecht's suggestion that the county attorney might be notified of Blakley's uncooperative behavior"); *State v. Strayhand,* 184 Ariz. 571, 580-81, 911 P.2d 577 (Ct. App. 1995) (when defendant refused to talk, detectives told him that they were going to "file their recommendation that he was uncooperative"); *Passama v. State,* 103 Nev. 212, 215, 735 P.2d 321 (1987); *State v. Tuttle,* 650 N.W.2d 20, 35 (S.D. 2002); *cf. State v. Banks,* 260 Kan. 918, 923-24, 927 P.2d 456 (1996) (If the accused was not deprived of his free choice to admit, deny, *or refuse to answer,* the statement may be considered voluntary.) (citing *State v. Zimmerman,* 251 Kan. 54, 833 P.2d 925 [1992]).

*State v. Tuttle* merits discussion. There, the South Dakota Supreme Court addressed a suspect in an aggravated assault case who had been told by a detective while in custody that the detective's report would be written to make things look good for the defendant or that the detective was "gonna have to write it up that you're not cooperating, you're being a real jerk about it." 650 N.W.2d at 35. The court concluded, "The unmistakable message was, if Tuttle refused to confess, then the report to the authorities would be written to discourage any leniency, meaning Tuttle would likely suffer more severely for not confessing. This was coercive." 650 N.W.2d at 35. The court held that the threat was one factor to consider in the totality of circumstances to determine voluntariness of his confession. It ultimately concluded Tuttle's will was over-

borne and the overreaching police conduct was causally related to the confession, *i.e.*, it was involuntary.

Similarly, in *Passama v. State,* in which the defendant confessed to lewdness with a minor, the Nevada Supreme Court observed:

"The promises [Sheriff] Miller made to Passama are the crucial aspect of the interrogation. If these promises, implicit and explicit, tricked Passama into confessing, his confession was involuntary. [Citation omitted.] Miller told Passama that he would tell the prosecutor if Passama cooperated. This can be a permissible tactic. *United States v. Tingle,* 658 F.2d 1332, 1336, n.4. (9th Cir. 1981). Miller also told Passama he would go to the D.A. and see Passama went to prison if he was not entirely truthful. It is *not* permissible to tell a defendant that his failure to cooperate will be communicated to the prosecutor. *Tingle,* 658 F.2d at 1336, n.5." 103 Nev. at 215.

In *Passama,* the sheriff told Passama, "Ed, don't sit there and lie to me, 'cause if you're lying to me I'll push it and I'll see that you go to prison . . . . Go into court not lying and we'll help you. . . . [B]ut if you lie I'll tell the D.A. to go all the way." 103 Nev. at 215. According to the court, this "carrot and stick" approach yielded results, and "[t]he sheriff continued to suggest how the improper fondling of the girls had occurred until he secured the written confessions." 103 Nev. at 215, 216. After examining the totality of the circumstances, the court concluded "that Sheriff Miller used impermissibly coercive methods to extract Passama's confession." 103 Nev. at 215.

We agree with the rationale and holdings of the decisions cited. In particular, we hold that threatening Swanigan with telling the county attorney of his lack of cooperation is inconsistent with his rights articulated in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). There, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination from the inherent pressures of the interrogation atmosphere. Included in the mechanism is a requirement for informing the suspect of the right to remain silent, accompanied by the assurance of a continuous opportunity to exercise it throughout the interrogation. 384 U.S. at 444, 467, 479, 490. "Our aim is to assure that the individual's right to choose between silence and speech remains

unfettered *throughout the interrogation process."* (Emphasis added.) 384 U.S. at 469.

As the *Miranda* court stated: "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." 384 U.S. at 468 n.37. Accordingly, we fail to see how law enforcement can be required by *Miranda* to advise Swanigan of his right to remain silent, and then can be allowed to warn him of punishment for his "noncooperation" when he exercises that right. Accordingly, we need not determine whether this tactic otherwise constitutes a "threat" under K.S.A. 2004 Supp. 60-460(f). On the other hand, we do not regard this tactic as one which makes the confession involuntary per se, but rather as one factor to be considered in the totality of circumstances. See, *e.g., Tuttle,* 650 N.W.2d at 35; *Passama,* 103 Nev. at 214.

Turning now to the assertion that detectives told Swanigan he would be charged for five convenience store robberies instead of just one unless he confessed, we first examine general statements of Kansas law.

K.S.A. 60-460(f) provides in relevant part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused . . . (2) was not induced to make the statement . . . (B) by *threats* or promises *concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."* (Emphasis added.)

See *State v. McBroom,* 252 Kan. 376, 382, 845 P.2d 654 (1993); *State v. McCarther,* 197 Kan. 279, Syl. ¶ 4, 416 P.2d 290 (1966) (confession inadmissible when elicited by force or threats).

No Kansas cases have addressed this specific issue. However, *Aguilar v. State,* 106 N.M. 798, 751 P.2d 178 (1988), is directly on point. Among other things, during Aguilar's interrogation the po-

lice chief implied that if Aguilar did not confess to the burglary, he would be charged in connection with unrelated incidents of vandalism in town. Aguilar then confessed. In examining interrogation techniques quite similar to those in the instant case, the New Mexico Supreme Court held:

"Chief Barela's interrogation alternated between threatening the defendant with charges in connection with unrelated incidents of vandalism in Dexter and assuring the defendant that a confession to the burglary would be looked upon favorably by all concerned. In the totality of the circumstances, this interrogation technique is preponderant. In comparison with all evidence to the contrary, these implied threats and promises, especially when knowingly made to a defendant with diminished mental capacity, rendered the confession involuntary as a matter of law. *See State v. Tindle,* 104 N.M. 195, 718 P.2d 705 (Ct. App. 1986)." 106 N.M. at 800.

Our decision in *State v. Stuart,* 206 Kan. 11, 476 P.2d 975 (1970), is consistent with the *Aguilar* holding. There, this court found that the defendant was induced to confess that he took certain sums of money from the local Elks Club in exchange for a promise that he would not be prosecuted if the matter was settled. The court also expressed the bargain as the result of a threat: "Members of the Elks Club were sure they could recover money from the appellant and unless he did something to meet the demands, he would be prosecuted." 206 Kan. at 14. After quoting K.S.A. 1970 Supp. 60-460(f), this court found that "because of the apparent sanction given the action of Elks members by the county attorney, the defendant was justified in believing he would be prosecuted if he did not admit to the taking of the money." 206 Kan. at 15. The court held that this prejudiced the defendant and, due to other prejudice caused by "Lady Elks" serving on the jury, reversed his burglary conviction and granted him a new trial.

*Low Intellect and Anxiety as Circumstances*

Lastly, Swanigan argues his low intellect and his susceptibility to being overcome by anxiety should be considered in the totality of the circumstances as we examine the voluntariness of his confession. See *State v. Lane,* 262 Kan. 373, 386, 940 P.2d 422 (1997) (mental condition is only one factor). He also cites *Crane v. Kentucky,* 476 U.S. 683, 687, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986):

"It is by now well-established that 'certain interrogation techniques, either in isolation, *or as applied to the unique characteristics of a particular suspect,* are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.' " (Emphasis added.)

We agree with Swanigan that these factors should be considered. See *State v. Mays,* 277 Kan. 359, 374, 376, 85 P.3d 1208 (2004) (verbal IQ of 77); *Lane,* 262 Kan. at 386 (IQ of 77); *Aguilar v. State,* 106 N.M. at 800 (expert witness testimony that interrogation was stressful on suspect, possibly causing him to act impulsively).

As noted previously, the trial court did not specifically assess Swanigan's IQ of 76 as a factor in the voluntariness determination. Nor did the court consider his psychological state during the interrogation, finding only that it was insufficient to make the police interrogation improper at all. Our review of the record, including the audiotape of the October 31 interrogation, discloses that Swanigan's relatively low IQ and his susceptibility to being overcome by anxiety played a part in his alternating denials and confessions (which themselves varied considerably). His confession began to unravel for the last time when the robber in the photo was wearing the wrong clothes. Swanigan then admitted his prior details about the robbery had come solely from the officers, claimed they had forced him to falsely admit he committed the robbery, and when Lanham denied forcing him, he explained, "When I try to tell you the truth you guys say it's me."

*Totality of Circumstances*

Although any one of these factors which Swanigan asserts — his low intellect and susceptibility to being overcome by anxiety, the officers' repeated use of false information, and their threats and promises — may not be sufficient to show coercion, the combination of all of them in this case leads us to conclude as a matter of law that Swanigan's October 31 statement was not the result of his free will, but was involuntary.

Under quite similar circumstances, the New Mexico Supreme Court concluded the same in *Aguilar v. State,* 106 N.M. 798. There, the chief of police interrogated the suspect and acknowl-

edged that he encouraged Aguilar to confess to the burglary by assuring him that a confession to the crime would be taken into favorable consideration by everyone concerned; the chief further admitted having told Aguilar that the police had found the perpetrator's fingerprints at the scene, although no fingerprints were introduced at trial; the chief further admitted having implied that, if Aguilar did not confess, he could be charged in connection with unrelated incidents of vandalism in town; Aguilar's IQ was 70, placing him on the borderline of mental retardation; a forensic evaluator testified that the interrogation would have been stressful on Aguilar, possibly causing him to act impulsively. Using the totality of the circumstances test, the court held the admission to be involuntary, reversing the trial court and the court of appeals.

We acknowledge that there must be a link between the coercive conduct of the State and the confession. *Colorado v. Connelly,* 479 U.S. 157, 164-65, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986); *Lane,* 262 Kan. at 386; *State v. Strauch,* 239 Kan. 203, 212-13, 718 P.2d 613 (1986). A thorough review of the record, as partly evidenced by the facts set forth in this opinion, clearly shows that Swanigan's numerous changes in story, whether in denial or in confession, usually occurred shortly after the officers lied to or threatened him. As such, his October 31 statement should have been excluded as evidence at trial. See *Arizona v. Fulminante,* 499 U.S. 279, 310, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991).

*Taint*

As for Swanigan's November 1 statement, we observe that like his October 31 statement, the police approached Swanigan, *Mirandized* him, and he waived his rights. But unlike the earlier statement, it was short and not recorded, perhaps because its main purpose, according to Sweeney, was to implicate Marcus Brown, not to incriminate Swanigan. The only evidence of the statement's content at the suppression hearing consists of Sweeney's brief testimony. The gist of Swanigan's statement is contained in the following excerpt:

"Q: Did the defendant make any statements at that time?

"A: Yes. He told me that he obtained the gun from Marcus Brown and left, or, and that he left in a Marisha McWilliams's vehicle, went to the bowling alley, talked to Marisha, who was still at work. Then he went by Jessica Wegele's house, but she was not home. He then drove down Centennial Road to Cloud. He parked his vehicle in the Tally Ho trailer court, stayed there a couple minutes planning the robbery. He walked up to the window, looked inside to make sure no one was there and then went in and robbed the place. And he said that the clerk looked like a female. He got anywhere from one to two hundred dollars. Then he corrected himself, that it was more than two hundred.

"Q: Then, did he start to change his attitude or his willingness to speak with you?

"A: Yes. *As in the other interviews that we were talking to him, you would ask him questions and he would just start making other statements that we know were not true, and so then I terminated the interview.*" (Emphasis added.)

The trial court considered the October 31 and November 1 statements together, concluding that both were voluntarily made and both should be admitted into evidence. On appeal, the parties do the same, *i.e.*, the State argues both were voluntary and Swanigan argues both were involuntary. However, now that we have held that the first statement was involuntary, the analysis of the second statement is modified. In addition to considering the totality of the circumstances per *State v. Sanders*, we must also consider whether the coercion of the first statement "tainted" the voluntariness of the second, rendering it involuntary.

Kansas appellate courts have addressed similar situations, usually involving a failure to *Mirandize* the defendant before at least one of the statements. See, *e.g.*, *State v. Hebert*, 277 Kan. 61, 82 P.3d 470 (2004); *State v. Lewis*, 258 Kan. 24, 899 P.2d 1027 (1995). However, no Kansas appellate court has addressed a situation when a *coerced Mirandized* statement may affect the second *Mirandized* statement. Accordingly, we look to other jurisdictions.

In *United States v. Marenghi*, 109 F.3d 28 (1st Cir. 1997), the First Circuit Court of Appeals explained the different approaches required for analyzing (1) a situation concerning merely an un-*Mirandized* statement and (2) a situation concerning a truly coerced statement:

"There is an enormous difference . . . between 'the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned [un-*Mirandized*] but uncoercive question' and 'the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated

to break the suspect's will . . . .' [*Oregon v. Elstad,* 470 U.S. 298, 312, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985)]. As such, when the infirmity underlying an initial statement transcends the mere failure to follow the dictates of *Miranda,* the determination as to the admissibility of a subsequent statement is much more involved. A careful and thorough administration of *Miranda* warnings alone is not necessarily sufficient to ensure the validity of the subsequent statement. See [470 U.S. at 310].

"This is so because the danger exists that the coercive nature of the circumstances under which the initial statement was obtained lingered in the mind of the defendant at the time he or she provided the subsequent statement, irrespective of the fact that he or she had been advised of the *Miranda* warnings and made the subsequent statement in an atmosphere devoid of coercion or compulsion. [Citation omitted.] In this instance, a court cannot determine the admissibility of the subsequent statement solely by examining the circumstances surrounding that statement. Instead, it must determine whether the subsequent statement is sufficiently removed from the milieu of the coerced statement so as to preclude any lingering taint." 109 F.3d at 32.

The *Marenghi* court agreed with the trial court's determination that the second statement had been voluntarily made, but then proceeded to determine

"whether the written statement could possibly have been tainted by any coercion lingering from the [first statement]. In order to resolve this issue, we must compare and contrast the circumstances surrounding each of the two statements. In so doing, we look to several factors; [1] the change in the place of the interrogations; [2] the time that passed between the statements; and [3] the change in the identity of the interrogators. See *Oregon v. Elstad,* 470 U.S. at 310, 105 S. Ct. at 1293-94." *Marenghi,* 109 F.3d at 33.

See *Watson v. Detella,* 122 F.3d 450 (7th Cir. 1997); *United States v. Perdue,* 8 F.3d 1455; *United States v. Jenkins,* 938 F.2d 934 (9th Cir. 1991); *United States v. Wauneka,* 770 F.2d 1434 (9th Cir. 1985); *State v. Edward B.,* 72 Conn. App. 282, 289, 806 A.2d 64 (2002) ("If the first statement actually was coerced in violation of the fifth amendment, however, the second statement is inadmissible 'unless it can be shown that due to the 'break in the stream of events' the taint from the earlier prewarning confession has been removed from the subsequent postwarning confession."); *State v. Evans,* 144 Ohio App. 3d 539, 760 N.E.2d 909 (2001); *State v. Juarez,* 120 N.M. 499, 903 P.2d 241 (Ct. App. 1995).

*United States v. Jenkins* is directly on point. There, the court held that the suspect's first *Mirandized* confession had been co-erced. Accordingly, it needed to examine whether that coercion tainted the second *Mirandized* confession. The court, in conclud-ing the second statement had been tainted and was involuntary, stated as follows:

"Determining whether the taint had dissipated sufficiently is merely another way of asking whether the subsequent confession was, itself, involuntary. This inquiry 'depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances.' *Lyons v. Oklahoma*, 322 U.S. 596, 602, 88 L. Ed. 2d 1481, 64 S. Ct. 1208, 1212 (1944) (citation omitted). Specifically, we look to [1] the temporal proximity of the co-ercive misconduct to the confession, [2] the presence of intervening circumstances which attenuate and dissipate the coercive effects of that misconduct, and, par-ticularly, [3] the purpose and flagrancy of that [prior] misconduct. *Brown v. Illi-nois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 95 S. Ct. 2254, 2261-62 (1975). As with the initial confession, it is the government's burden to prove this confession admissible. [422 U.S. at 604]." 938 F.2d at 941.

Similarly, the Tenth Circuit Court of Appeals in *United States v. Perdue*, 8 F.3d 1455, concluded that the government failed to show that the coercion surrounding the first, albeit un-*Mirandized*, statement had been sufficiently dissipated so as to make the second *Mirandized* statement voluntary. The court examined the length of time that passed between the two confessions, the addition of new pressures, and the absence of any meaningful intervening circum-stances which would indicate that the second confession was in-sulated from the effect of all that went before. 8 F.3d at 1467-69. Stated another way, "[t]he later confession will be admissible while the first confession will not 'only if such a distinction is justified by a sufficiently isolating break in the stream of events.'" 8 F.3d at 1467-68.

With these holdings in mind, we observe that according to Swee-ney's testimony, Swanigan's second statement occurred at 1 p.m., approximately 19 hours after his first. As with the first statement, Sweeney and Lanham were again interrogating Swanigan; only Feldman was absent. Since Swanigan had been arrested and in-carcerated the evening before, it appears the interrogation again was conducted at the police station, perhaps in the same interview

room as the first interrogation. Swanigan repeated the same general facts, including the same ones he had stated incorrectly 19 hours before. Furthermore, there is no evidence of intervening circumstances which would attenuate and dissipate the coercive effects of the evening before except the passage of time, which, when considering an individual with an IQ of 76 who is also susceptible to being overborne by anxiety, may mean little. On the other hand, we do observe that the prior misconduct was not physical nor necessarily "flagrant."

We conclude that the State has failed to meet its burden of showing the second statement was untainted by the first, *i.e.*, that the second was voluntary as well. See *Perdue*, 8 F.3d 1455, 1467-68 (same agent who conducted first coercive interrogation present for the second was a factor in finding taint from the first interrogation; same location for both interrogations a factor in finding taint from the first interrogation); *Jenkins*, 938 F.2d 934, 941 (no significant intervening circumstances which might have purged the taint from the initial coerced confession were brought to court's attention); *United States v. Lee*, 699 F.2d 466, 469 (9th Cir. 1982) (the second confession, a virtual repetition of the first, was obtained less than 24 hours after the first confession was elicited; Ninth Circuit held it was not clearly erroneous for district court to conclude that "no intervening event of significance occurred so as to purge the taint of the illegally obtained confession"). Accordingly, the November 1 statement should also have been excluded as evidence at trial.

We reemphasize that a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. *State v. Lane*, 262 Kan. 373, 385, 940 P.2d 422 (1997). We also emphasize that voluntariness of confessions is determined by a totality of the circumstances, *Sanders*, 272 Kan. at 452, and that none of the circumstances in the instant case alone make the confession involuntary per se. Finally, we point out that the determination of whether the coercion of one statement taints another is also necessarily fact sensitive. Consequently, a broad reading of our opinion today is expressly discouraged.

## Harmless Error Analysis

With our decision to exclude the statements from evidence, the issue becomes whether their admission was harmless or reversible error. In *State v. Esquivel-Hernandez*, 266 Kan. 821, 825, 975 P.2d 254 (1999), this court stated that the use of an involuntary statement of a criminal defendant is a denial of due process of law, even though there is ample evidence to support the conviction, and found that the harmless error rule did not apply, citing *Mincey v. Arizona*, 437 U.S. 385, 398, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978). Only once have our appellate courts cited *Esquivel-Hernandez* for this same proposition. See *Cellier v. State*, 28 Kan. App. 2d 508, 516, 18 P.3d 259, *rev. denied* 271 Kan. 1035 (2001).

In *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991), however, a majority of the United States Supreme Court specifically held that the harmless error rule *did* apply to the erroneous admission of an involuntary confession. Eight years later the Supreme Court cited its *Fulminante* decision in *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), which was released 2 months after our decision in *Esquivel-Hernandez*. In *Neder,* the Court reiterated that so-called "structural errors" subject to automatic reversal exist in a very limited class of cases. 527 U.S. at 8. Consequently, until such time as the United States Supreme Court should hold otherwise, we choose to follow its ruling in *Fulminante* that the harmless error rule does apply to the erroneous admission of an involuntary confession. Any language to the contrary in *Esquivel-Hernandez* and *Cellier* is therefore disapproved.

We have stated the harmless error rule in cases involving constitutional concerns as follows: "If this court possesses a firm belief beyond a reasonable doubt that an error of constitutional magnitude had little, if any, likelihood of having changed the result of the trial, it may be declared harmless." *State v. Ewing*, 258 Kan. 398, 403, 904 P.2d 962 (1995) (defendant in custody and should have been advised of his rights prior to interrogation, making statement inadmissible); see *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). This court has the power to review

the record de novo in order to determine an error's harmlessness. *Fulminante*, 499 U.S. at 295.

In the instant case, other than the surveillance video — which the State's witnesses themselves admitted is too blurry to conclusively determine the robber's identity — no direct evidence and very little circumstantial evidence places Swanigan at the Kwik Shop the morning of the robbery. Accordingly, we do not possess a firm belief beyond a reasonable doubt that the inclusion of Swanigan's involuntary statements had little likelihood of changing the result at trial. We reverse and remand for a new trial at which Swanigan's involuntary statements to the police on October 31 and November 1, 2000, are not admissible.

Issue 2: *Did the trial court err by failing to give a jury instruction regarding the voluntariness and truth of Swanigan's statements?*

With our decision to suppress Swanigan's statements, this issue is now moot.

The decision of the trial court, and the decision of the Court of Appeals affirming that court, is reversed and the case is remanded for new trial.

McFARLAND, C.J.: Concurring in the result.