NOT DESIGNATED FOR PUBLICATION

No. 119,872

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

THEODORE JAMES PURDY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK JR., judge. Opinion filed April 17, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MALONE and GARDNER, JJ.

PER CURIAM: Theodore James Purdy appeals his convictions of rape and aggravated indecent liberties with a child. Purdy claims: (1) the district court erred by denying his motion to suppress statements he made to law enforcement; (2) those statements, by themselves, were insufficient evidence to support his convictions; (3) the district court erroneously admitted hearsay evidence about the allegations against him; (4) the district court erred by admitting evidence in which law enforcement asked him to comment on his alleged victim's credibility; (5) the district court erred in instructing the jury on mental culpability; (6) the prosecutor committed reversible error by arguing facts

1

not in evidence; and (7) cumulative error denied him a fair trial. Finding no reversible error based on the claims made by Purdy, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2016, Detective Mark Montague of the Jackson County Sheriff's Office received a call from the Eudora Police Department informing him that a man (Grandfather) had reported a possible molestation of his three-year-old granddaughter, A.L., that had occurred in Jackson County. The alleged perpetrator was 26-year-old Theodore James Purdy, who was dating Grandfather's daughter, A.L.'s mother (Mother). Grandfather alleged that Purdy had inserted objects, including a crayon, into A.L.'s vagina. At the time, Purdy, Mother, and A.L. lived together. Grandfather also had been living at the home, but was moving out, at Purdy and Mother's request.

Montague contacted Purdy, who voluntarily came to the sheriff's office on October 15, 2016, for an interview. Montague advised Purdy of his *Miranda* rights, and when Montague told Purdy about the allegations against him, Purdy denied that anything improper had happened. At Montague's request, Purdy agreed to speak with an agent of the Kansas Bureau of Investigation (KBI) and submit to a polygraph examination.

The same day, Mother and A.L. moved out of Purdy's home and Montague came to the house to search it for a white and a pink crayon. Purdy consented to and assisted in the search and ultimately Montague seized some crayons. Montague did not send anything seized from Purdy's home for testing.

On October 20, 2016, KBI Senior Special Agent James Bridges met with Purdy at the sheriff's office for an interview that lasted over three hours. After again advising Purdy of his *Miranda* rights, Bridges administered the polygraph. Although Purdy at first denied touching A.L. inappropriately, he eventually stated that on one occasion he had

2

accidentally inserted his middle finger up to the first knuckle into A.L.'s vagina for between five to six seconds while bathing her.

After Bridges finished speaking with Purdy, Montague returned to the room and confirmed with Purdy his admission that he had inserted his finger into A.L.'s vagina. Purdy was arrested and taken to the jail. Soon after, Montague received a message that Purdy wished to speak with him. Montague went over to the jail, where Purdy told him that it was not an accident, it was out of curiosity. Montague and Purdy returned to the interview room at the sheriff's office, where their conversation was recorded, and Purdy again stated that about a month earlier, while bathing A.L., he had inserted his middle finger up to the first knuckle into A.L.'s vagina for about five seconds out of curiosity.

On November 2, 2016, the State charged Purdy with one count of rape and one count of aggravated indecent liberties with a child, both off-grid person felonies. The State later requested a hearing on the admissibility of Grandfather's anticipated testimony about the allegations A.L. made to him and a hearing to determine A.L.'s availability as a witness. Purdy then filed a motion to suppress, arguing that his inculpatory statements to Bridges were coerced and involuntary; a motion seeking to exclude any evidence that he took a polygraph or any interpretation of the polygraph results; and a motion seeking an order barring the State from introducing any evidence or testimony which would amount to an opinion of the credibility of the defendant or any other witnesses. The district court later granted Purdy's motions about his polygraph results and about witness credibility.

On January 18, 2018, the district court held an evidentiary hearing on the motion to suppress, at which Montague and Purdy testified and at which the State submitted four exhibits: three recordings of the interview and polygraph examination, from different camera angles, and the recording of Purdy's post-arrest statement to Montague. At the same hearing, the district court heard evidence about A.L.'s availability as a witness and,

3

after the State and defense counsel questioned A.L., the district court ruled that A.L. was available and qualified to testify under K.S.A. 60-417.

On January 30, 2018, the district court issued its written decision denying Purdy's motion to suppress. The district court found that Purdy's statements during his polygraph examination and interview with Bridges were freely and voluntarily made. The district court also found that even if those initial statements were not freely and voluntarily made, the attenuation doctrine applied to allow the admission of Purdy's statements in his post-arrest statement to Montague.

The jury trial occurred on May 15, 2018. After opening arguments, Purdy renewed his motion to suppress and the district court denied it for the reasons previously given. Purdy did not ask for a continuing objection. Bridges and Montague testified for the State. The State also played for the jury portions of Bridges' interview with Purdy and of Montague's pre- and post-arrest interviews with Purdy.

After the State rested, Purdy moved for a mistrial on the grounds that the video played for the jury was not properly redacted—the polygraph machine was visible in the video and the video contained statements Purdy felt warranted a mistrial:  (1) Bridges said that either A.L. was a liar or Purdy committed the acts alleged, and (2) Purdy said that child molesters should be castrated and hanged. Purdy also moved to dismiss one of the two charges for lack of evidence. The judge denied both motions.

Purdy's father testified on his behalf, stating that after Purdy and Mother began living together, Purdy came to him with concerns about changing A.L.'s diaper. Having taken care of his own daughter as a child, Purdy's father instructed Purdy that to change A.L.'s diaper, "[y]ou got to spread her a part [*sic*] a little bit, wipe both sides, and check the hole to see if there is anything compacted in there. And if there is, you have to get it

4

out," using the tip of his finger or Q-tips or, if he was uncomfortable doing that "just set her in the tub and let her splash around."

Purdy testified on his own behalf. A combat veteran who had served in the Marines, Purdy had been diagnosed with "PTSD for particularly survival skills for one of my buddies [who] stepped on [an] IED and got blown up" while Purdy was nearby. Since then, Purdy had tried to avoid confrontation. He testified: "[D]ue to my military history and my diagnoses, when I get pressured or anything, I have very high anxiety. And I get into a bubble or a little thing, and will just say what they want to hear to get out of it."

Purdy testified that his statement to Bridges that he had inserted his finger into A.L.'s vagina was inaccurate because "all I was doing was cleaning [A.L.]." He maintained that although he told law enforcement that he put his finger in A.L.'s vagina, he had not done so. He said that he had said that he had because Bridges and Montague told him that if he did, he would have good faith with the DA of Jackson County.

Purdy testified that A.L. was being potty trained in October 2016 and although A.L. generally could wipe her own bottom, he still helped her when she asked or when it was a big accident. According to Purdy, A.L. had an accident that covered her and he had "spread the lips . . . and use[d] the tip of [his] finger to brush [and] make [sure] it was done." He was having trouble cleaning all the feces off of A.L., so he put her in the bathtub and "started splashing water on it." When that did not work, he "used [his] finger to brush it off into the water, make sure it was clean." Purdy testified that it made him uncomfortable, but he was afraid if he told Mother that he was not ready to have kids, she would break up with him.

When asked on cross-examination why he had not mentioned A.L.'s accident during his interviews with law enforcement, Purdy stated that he "didn't think about it as being a big deal. It's just the kid had had an accident and you had to clean it." He

5

explained that in his post-arrest statement to Montague about whether any touching was out of curiosity, he meant that "if there was any curiosity there, it would have been to see if I even was doing it right. And, like, when I get in the bubble, I say what they want to hear. And special Agent Bridges was the first one that said the word curiosity to me." He testified that when he talked to Montague, "at that point in time I was already mentally done. So I just said what he wanted to hear." After Purdy testified, the defense rested.

The jury deliberated for just over an hour and found Purdy guilty of both charges. On July 13, 2018, after denying Purdy's motion for new trial, the district court sentenced Purdy to two concurrent hard 25 sentences. Purdy timely filed a notice of appeal.

DID THE DISTRICT COURT ERR IN DENYING PURDY'S MOTION TO SUPPRESS?

Purdy first claims the district court erred by denying his motion to suppress his statements to law enforcement. He contends that his statements were involuntary because the combination of his mental illnesses and Bridges' and Montague's coercive conduct overcame his free and independent will. The State argues that Purdy's confession to law enforcement was not coerced nor involuntary.

Before trial, Purdy moved to suppress his statements to Bridges and Montague as involuntary. The district court held an evidentiary hearing on the motion and denied it. After opening arguments but before the State called its first trial witness, Purdy renewed his motion to suppress and the district court again denied it. He did not request a continuing objection, nor did he contemporaneously object when Bridges testified that Purdy said he had "insert[ed] a finger into the girl's vagina."

Purdy did object to the admission into evidence of State's Exhibits 1 and 2, the recordings of his pre- and post-arrest statements to Bridges and Montague. But Purdy objected to State's Exhibit 1 on unclear grounds: "[W]e've already had a ruling on the

6

admissibility of that. And I don't think that's a redacted copy." Similarly, when the State sought to admit and publish State's Exhibit 2, Purdy objected only: "I renew my prior objection." Moreover, the State did not offer State's Exhibit 1 until after Bridges had testified—without objection—about Purdy's statements as reflected therein.

Purdy's in-trial objections were not specific, he did not contemporaneously object to Bridges' testimony about the inculpatory statements, and he failed to request or obtain a standing objection when he renewed his motion to suppress after opening arguments. Arguably, Purdy did not preserve this issue for appellate review. See *State v. Holman*, 295 Kan. 116, 127, 284 P.3d 251 (2012) (holding that the defendant's failure to timely renew a pretrial objection during trial "precludes appellate review"), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 810-11, 375 P.3d 332 (2016). Yet the State does not challenge the preservation of this issue. And even in the context of the admission of evidence, "the preservation requirement is a prudential rather than jurisdictional bar to appellate review." *State v. Hart*, 297 Kan. 494, 510, 301 P.3d 1279 (2013). As a result, we will address the merits of Purdy's claim on appeal.

> "We use a bifurcated standard of review when considering a district court's decision on a motion to suppress evidence. First, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. Second, we review the ultimate legal conclusion de novo. [Citations omitted.]" *State v. Palacio*, 309 Kan. 1075, 1081, 442 P.3d 466 (2019).

As noted above, Purdy was advised of his *Miranda* rights and he does not contest the validity of the advisory or his waiver of those rights. As he did in the district court, Purdy asserts that his pre-arrest statements to Bridges and Montague, as reflected in State's Exhibit 1, were coerced and involuntary. As to his post-arrest statements to Montague, he argues only that the district court should have suppressed them as fruit of

7

the poisonous tree. As a result, this court's analysis focuses—as did the district court—on the voluntariness of Purdy's statements to Bridges and Montague before his arrest.

> "Based on the Fifth Amendment right against self-incrimination and the Fourteenth Amendment Due Process Clause, a coerced confession is inadmissible. Although 'rare,' a confession can be coerced even if officers complied with *Miranda* and the unaccused unambiguously waived the right to counsel.
>
> "The primary consideration when considering whether a confession was coerced is 'voluntariness.' . . . To decide whether a confession was involuntary, the court looks to the totality of the circumstances after considering a list of six nonexclusive factors:
>
> "'"(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language."' [Citations omitted.]" *Palacio*, 309 Kan. at 1087.

"The State has the burden to prove by a preponderance of the evidence that a confession was voluntary." *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009).

*Additional facts about the polygraph and interview*

Because a voluntariness analysis requires consideration of the totality of the circumstances, Purdy's entire interview with Bridges and the included polygraph examination is relevant. During the first 20 minutes of the interview, Bridges advised Purdy of his *Miranda* rights, obtained a waiver of those rights, and collected background information such as Purdy's address, his work history, and his medical history. Within the first five minutes, Bridges informed Purdy that he could stop the interview and leave whenever he wanted to, and Purdy said that he understood he could stop at any time and he was present of his own volition. Bridges spent almost 10 minutes explaining the polygraph process to Purdy, then Purdy took a 3-minute break to use the bathroom.

8

After the short break, Bridges began asking Purdy about his relationship with Mother and A.L. and the allegations against him. When directly asked, Purdy denied ever putting anything into A.L.'s vagina. He specifically denied ever putting crayons into A.L.'s vagina, ever putting barrettes or hair ties into A.L.'s vagina, ever putting a finger into A.L.'s vagina, and ever putting anything else into A.L.'s vagina, including "[his] tongue, [his] penis, or any other type of foreign object." Purdy maintained he had never put anything into A.L.'s vagina, "not at all. Never."

Forty-six minutes into the interview, Bridges asked if there was "[a]ny possible way" Purdy could have touched A.L.'s vagina, and Purdy replied, "The only thing I can think of is whenever I'm giving her a bath. You know, make her stand up, take the washcloth." Purdy explained that when he bathed A.L., he gave her vagina a quick wipe with a washcloth or loofah, but when Bridges asked if there was any way Purdy had put anything into A.L.'s vagina while he was bathing her, Purdy replied there was "no possible way at all." Purdy also maintained that he did not wipe A.L.'s vagina as part of her ongoing potty training. During this portion of the interview, Purdy seemed at ease and he was forthcoming with information. Bridges did not raise his voice, and the atmosphere was friendly. At one point, Bridges referred to their conversation as "just b.s.-ing."

Fifty-one minutes into the interview, Bridges began telling Purdy the specific questions he would ask during the polygraph examination. When he finished explaining the questions, he offered Purdy a break, which Purdy declined. Bridges attached the polygraph equipment to Purdy and administered two practice tests so that Purdy could experience the pace of the testing; neither of the practice tests included questions about A.L.'s allegations against Purdy.

The first scored polygraph examination began one hour and twenty-two minutes into the interview. Bridges administered five tests, each lasting about five or six minutes, with short breaks between them. Each test included the questions "Did you ever put

9

anything into [A.L.'s] vagina," "Did you ever insert a crayon into [A.L.'s] vagina," and "Did you see anyone put a crayon into [A.L.'s] vagina," and Purdy consistently responded, "No." For the third, fourth, and fifth tests, Bridges instructed Purdy to repeat the last word of each question before answering yes or no, so when Bridges asked the three questions about the specific allegations, Purdy replied to each by saying, "Vagina. No." After the fifth test, Bridges said he had enough information and he removed the polygraph equipment from Purdy.

Bridges spent about 10 minutes scoring the test results, then told Purdy that he "showed significant response to the questions regarding [A.L.] and touching her vagina." Bridges assured Purdy that he did not think Purdy was "a bad guy," and sometimes people are "curious" or "make mistakes." Bridges said that in his 20 years of experience, most people he sees have just made mistakes and are regretful, but the rest of them "are actually like really bad people that are monsters who actually do stuff to hurt people like—that's like their nature—versus somebody who's . . . human and made a mistake." Bridges said that Purdy seemed like "normally a pretty good guy who made a mistake" and asked if he was right to think so. Purdy affirmed that he was a good guy, and he said that every time he said the word "vagina," his heart rate increased.

Bridges asked Purdy to tell him how many times he had put something into A.L.'s vagina, and Purdy replied that he had never done that. Bridges asserted that there was no doubt whatsoever that Purdy was showing significant response to the questions about inserting items into A.L.'s vagina. He asked Purdy to "help me understand what's going on with that," and Purdy again said the word "vagina" made him very uncomfortable. Bridges repeated that he had been "doing this" for over 20 years and when people had "responses" to questions, it meant they were not being truthful. According to Bridges, he only saw responses like Purdy's "when somebody's being deceptive." Bridges said that Purdy's response could not be attributed to discomfort with the word "vagina" because

Purdy is "not 12 years old," and Purdy repeated that thinking about the allegations made him very uncomfortable, but he had never inserted anything into A.L.'s vagina.

Bridges insisted that there was "no doubt whatsoever that [Purdy] had some sort of contact" and he reiterated his belief that Purdy was "in this category" with people who are "curious" and "do things that they normally wouldn't do." During this statement, Purdy shook his head emphatically to indicate no. Bridges then told Purdy that he had "a few guys" who had made mistakes while under the influence of drugs or alcohol, but they changed their lifestyles so "these types of things don't happen again." Bridges asked Purdy what he should say to Montague, whether he should say that there was no explanation for the test results or whether he should say that Purdy is "a good guy" and made a mistake and that is why the test showed what it did.

When Purdy began again to assert that he had "never, ever" inserted anything into A.L.'s vagina, Bridges interrupted and repeated that the only reason Purdy would have responded as he did was if he had "some sort of contact" with A.L. Purdy stated that he had only ever wiped A.L.'s vagina, and Bridges stated that the only reason Purdy would have had the response he did to the questions was if Purdy had inserted something into A.L.'s vagina. Bridges told Purdy "there's no doubt whatsoever" and he informed Purdy that he needed to figure out whether he should tell Montague that Purdy was "somebody that made a mistake" or "somebody that's a monster." Purdy repeated, "I don't know why it made me so uncomfortable, but it did." When Bridges asserted that the reason people are uncomfortable with questions is that they are involved in the related behavior, Purdy repeated, "But I haven't done it." Bridges responded by again referring to his experience administering and scoring polygraphs.

Two hours and 25 minutes into the interview, Bridges told Purdy that he has a good relationship with the prosecutors in the area but if he cannot explain a polygraph test failure, "their minds start to wander." Bridges insisted that he needed an explanation

11

for Montague and if it was "a first-time thing," they could "work with" it. Bridges told Purdy that when someone made a mistake for the first time, if the person was sorry and guaranteed it would not happen again, they could "work with that" by getting the person treatment such as family therapy or counseling.

Bridges began, "If it was an accident," and Purdy responded, "Well, it might have been an accident while I was bathing her." Bridges then asked Purdy to tell him about the "time it happened when you were bathing her" and Purdy replied that he was "doing her legs and then I did her vagina and then I sat her back down. And then that made me think [intelligible] that happened and it made me think was that wrong." When Bridges said, "[W]hen you put your finger in her vagina—," Purdy interrupted him, saying, "I didn't."

Bridges explained that there was a distinction between wiping and putting something in A.L.'s vagina, and Purdy said there had been one time his finger went in "a little bit." Bridges asked whether Purdy had "left it in there for two, three, four minutes," and Purdy stated that it had happened once when he was bathing A.L. and he estimated that his finger was in A.L.'s vagina for "maybe five" seconds. Upon further questioning, Purdy clarified that he had inserted the middle finger of his right hand to the top knuckle. He maintained that it was a complete accident and he did not think much of it. Bridges left the room shortly after confirming this statement.

Montague came into the room a few minutes later. He went over Purdy's statements to Bridges and when Purdy maintained that his finger going into A.L.'s vagina had been an accident, Montague said that he did not believe Purdy because Montague had a daughter whom he had bathed and that had never happened to him. Montague asked if Purdy had put his finger into A.L.'s vagina out of curiosity; Purdy shook his head and said, "I was just bathing her and it happened." He maintained that he was "just trying to make sure she was clean."

12

Montague left the room at three hours into the interview and returned about six minutes later with a man identified as Detective Caviness. Caviness said he did not believe that Purdy inserting his finger into A.L.'s vagina had been an accident, but Purdy maintained that it was. Caviness told Purdy he would be arrested, he handcuffed Purdy, and everyone left the room.

*The suppression motion and hearing*

On December 8, 2017, Purdy filed a motion to suppress, arguing that his statements to Bridges were coerced and involuntary. The State responded and disagreed. At a hearing on December 29, 2017, the district court requested supplemental briefing on the suppression issue, which both parties later provided.

In his supplemental briefing, Purdy asserted that he has been diagnosed with chronic PTSD with survivor's guilt, anxiety disorder, depressive disorder, migraines, and recurrent major depression, which made him more susceptible to coercion. He also alleged that he had complied with law enforcement's direction not to take his anti-anxiety medication on the day of the polygraph. He argued that the polygraph and the interview methods used after the test "created a coercive environment where [Purdy] felt that he must explain why the machine might have thought he was being deceptive." He contended that Bridges' statements about explaining to Montague whether Purdy was a monster or just someone who made a mistake were implied threats and his statements about having good relationships with local prosecutors were implied promises.

At the suppression hearing on January 18, 2018, Purdy clarified that he was "asking that [the court] find that the statements to Bridges were coerced and essentially that the follow-up statements were fruit of the poisonous tree." Montague testified at the hearing that the portion of the polygraph examination he observed included nothing that made him question the voluntariness of Purdy's answers. On cross-examination,

13

Montague testified that he remembered Purdy saying he had been diagnosed with PTSD, depression, and anxiety. The State submitted into evidence, without objection, videos of Bridges' and Montague's interactions with Purdy on the day of the polygraph.

Purdy also testified at the suppression hearing, asserting that during the phone call scheduling the polygraph, he asked Montague if he should take his regular medications that day and Montague told him not to take the psychotropics because it could affect the test. Purdy testified that at the time of the polygraph, he often took anti-anxiety medications, anti-depressants, anti-inflammatories, and a muscle relaxer. On cross-examination, Purdy testified that he took his anti-anxiety and anti-depressant medications three times per day, one pill each time. According to Purdy, when he took these medications, he was "alert, upright, ma[d]e better decisions, [and thought] clearly," but when he did not, he was "a completely different person"—"really anxious, nervous, go internal [*sic*], and just want to be away from everyone."

Purdy further testified that he had been diagnosed with anxiety, as well as PTSD from "survivor's guilt because I was on patrol in Afghanistan and one of my buddies stepped on an IED, and I felt that it was my fault (inaudible) being treated for it since 2012, 2011." Purdy had "issues with depression since [he] was 12 years old." He also testified that he was "on 80 percent disability, 60 percent of which is mental and the rest of the 20 is physical." After Purdy testified, the district court took the matter under advisement. On January 30, 2018, the district court issued its written decision finding that Purdy's statements were voluntary and thus denying Purdy's motion to suppress.

*Analysis*

As stated above, to decide whether Purdy's confession was voluntary, this court must examine the totality of the circumstances, including: (1) Purdy's mental condition, (2) the duration and manner of the interrogation; (3) Purdy's ability on request to

communicate with the outside world; (4) his age, intellect, and background; (5) Bridges' fairness in conducting the interrogation; and (6) Purdy's fluency with the English language. See *Palacio*, 309 Kan. at 1087. The district court addressed each of these six factors in its written ruling denying Purdy's motion to suppress. And Purdy does the same in his appellate brief. Purdy addresses each factor separately, concluding whether that factor weighs "for or against voluntariness" or does not weigh more heavily in either direction. But the Kansas Supreme Court has explained:

> "'These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of the circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.'
>
> "The essence of such an inquiry is to determine whether the accused's statement was the product of his or her free and independent will. However, '[f]or a confession to be involuntary based on coercive conduct of the State, there must be a link between the coercive conduct and the confession.' [Citations omitted.]" *State v. Mattox*, 305 Kan. 1015, 1043, 390 P.3d 514 (2017).

Thus, the analysis involves more than just counting factors that support or detract from a finding of voluntariness. Purdy does not allege that the manner and duration of the interrogation, his ability to communicate with the outside world upon request, or his fluency with the English language had a coercive effect on his statements or otherwise rendered them involuntary. Rather, Purdy argues that his mental condition; his age, intellect, and background; and the fairness of the interrogation show that his statements were not voluntary and thus the district court should have suppressed them. He claims that his statements were involuntary given his PTSD and depression, Bridges' repeated assertions that the polygraph results indicated there had been contact with A.L., and Bridges' and Montague's indications that they could help Purdy if he confessed.

15

*Purdy's mental condition*

Purdy asserts that the recording of his interview and polygraph shows him becoming "more and more agitated as the interview with Agent Bridges progressed and the agent refused to accept Mr. Purdy's denials." And, as Purdy asserts, the recording does show him moving his body back and forth and covering his face during the interview, which he characterizes as conveying that he was in great distress. Purdy also notes his testimony that he suffers from PTSD and, at Montague's direction, he had not taken some of his prescription medication before the interview with Bridges.

As to Purdy's argument about his medication, the district court found Purdy's suppression hearing testimony to that effect not credible. This court does not reassess witness credibility. See *Palacio*, 309 Kan. at 1081. And, as the district court noted, Purdy stated during the interview that he had "stopped taking [medication for his PTSD, depression, or anxiety] a long time ago." Thus, Purdy's assertion that his lack of anti-anxiety medication rendered his statements involuntary is irrelevant.

As for Purdy's mental health, the district court found that Purdy suffers from combat related mental conditions. But as the State asserts in its appellate brief, the existence of mental health diagnoses does not necessarily render statements involuntary. See *State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015) (noting prior schizophrenia diagnoses yet holding "there is no evidence [the defendant's] responses were unknowing or involuntary because he was suffering from schizophrenia"); *State v. Edwards*, 291 Kan. 532, 547, 243 P.3d 683 (2010) (declining to "opine that a person with bipolar disorder who is suffering a major depressive episode cannot freely, voluntarily, and knowingly give a statement to the police" when no such evidence was presented in the district court). And Purdy does not explain to this court how his depression, his disability status, or his PTSD render him more susceptible to coercion. As the district court found, "[n]othing about [Purdy's] mental condition suggests he was coerced."

16

In *Colorado v. Connelly*, 479 U.S. 57, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), the United States Supreme Court clarified that "police overreaching" is an "integral element" to finding a confession involuntary under the Due Process Clause of the Fourteenth Amendment. The Kansas Supreme Court has "recognized *Connelly* as controlling precedent," including *Connelly*'s holding that "'while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.'" *State v. Barrett*, 309 Kan. 1029, 1044, 442 P.3d 492 (2019). In other words, with no coercive police activity, a statement cannot be "rendered involuntary based on [a defendant's] mental condition alone." 309 Kan. at 1044-45.

*Purdy's age, intellect, and background*

Purdy makes similar arguments in relation to this factor, noting again that he "suffered from [PTSD] and depression, which was known to officers." But Purdy again fails to explain on appeal how those diagnoses or other aspects of his background made him more susceptible to coercion, nor does he otherwise tie them to the voluntariness calculus. And, as the district court found, Purdy "is an adult male with a high school education" who "made it through Marine boot camp" and "saw combat as a Marine." At the time of the interview, he was employed as a corrections officer.

*Bridges' fairness in conducting the interrogation*

Purdy contends that Bridges used two unfair and coercive techniques to elicit the inculpatory statements: (1) asserting that the polygraph showed Purdy had contact with A.L., and (2) suggesting to Purdy that if he confessed, Bridges could help him. The district court found "nothing shocking" in Bridges' behavior during the interview:

> "It is true that the officers asked difficult questions and explained their perspective, but '[a]n officer's exhortation to a suspect to tell the truth during questioning is insufficient to

17

make a confession involuntary.' If the accused is not deprived of his or her free choice to admit, deny, or refuse to answer, the statement is considered voluntary. The interrogation here was fair and the tactics used were more Barney Miller than Gestapo or Stasi."

Purdy contends that Bridges' assertions that the polygraph results showed he had touched A.L. were "well-studied coercive techniques that can easily lead to false confessions," while Bridges' assertions that he could help Purdy if Purdy confessed contributed to the coercive nature of the interview. In support, Purdy cites a 2004 North Carolina Law Review article that identifies "the first step of interrogation" as being to "shift[] a suspect from confident to hopeless" and describes the "most effective technique" for doing so as "confront[ing] him with seemingly objective and incontrovertible evidence of his guilt." See Drizin, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 915 (2004).

He also points this court toward *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005). In *Swanigan*, the Kansas Supreme Court reiterated its prior holding that officers' false statements to a suspect during an interrogation "did not alone make [the suspect's] confession involuntary," but "the false information must be viewed as a circumstance in conjunction with others" when determining the voluntariness of a confession. 297 Kan. at 32. But Purdy identifies no evidence in the record on appeal that shows that Bridges' assertions about the polygraph results were false. So Purdy has not established that Bridges made false representations about the results of the polygraph—that Purdy was being deceptive in his answers to questions about inserting an object into A.L.'s vagina. This alone materially distinguishes Purdy's situation from that present in *Swanigan*. See *Palacio*, 309 Kan. at 1088-89 (noting that in *Palacio*, "it appears that the officers did not tell any untruths, unlike the officers in *Swanigan*").

The *Swanigan* court also held that "threatening [a suspect] with telling the county attorney of his lack of cooperation is inconsistent with his rights articulated in *Miranda*."

18

*Swanigan*, 279 Kan. at 36. In *Swanigan*, law enforcement told the suspect: "'[W]e can write the report where it shows that you're willing to get this straightened out' and, if not, ' . . . we're going to charge you with aggravated robbery. We're gonna show [the county attorney] that you're not cooperating with us.'" 279 Kan. at 33. Although Bridges' statement to Purdy was less direct, Bridges did say that he has "a good relationship" with local prosecutors and if he cannot offer them an explanation for a test failure, "their minds start to wander." Like the statement the Kansas Supreme Court found impermissible in *Swanigan*, Bridges' statement could be construed to "warn [Purdy] of punishment for his 'noncooperation'" if he exercised his right to remain silent. See 279 Kan. at 37. The *Swanigan* court continued, however, that "we do not regard this tactic as one which makes the confession involuntary per se, but rather as one factor to be considered in the totality of circumstances." 279 Kan. at 37.

*Totality of the circumstances*

The ultimate consideration of a voluntariness analysis is viewing the totality of the circumstances to determine "'whether the statement was the product of [Purdy's] free and independent will.'" See *Barrett*, 309 Kan. at 1042. Even if Bridges' statements about prosecutors' "minds wandering" unless they received an explanation for Purdy's test failure were coercive, the totality of the circumstances here show that Purdy's inculpatory statements were the product of his free and independent will. The district court did not err by concluding that the State proved by a preponderance of the evidence that Purdy's inculpatory statements were voluntary. Purdy's only challenge to the admission of his post-arrest statements to Montague is that they were fruit of his involuntary statements to Bridges. As a result, since Purdy's statements to Bridges were voluntary, his challenge to his post-arrest statements necessarily fails.

Purdy next claims there was insufficient evidence of rape and aggravated indecent liberties with a child. More specifically, he argues that the only evidence of the crimes submitted to the jury was his alleged confession which he characterizes—under the corpus delicti rule—as insufficiently trustworthy to support his convictions without independent corroborating evidence, which he asserts the State did not produce. The State disagrees, arguing that Purdy's confession was trustworthy enough to establish the corpus delicti of Purdy's crimes of conviction.

"Corpus delicti is Latin for 'body of the crime.'" *State v. Dern*, 303 Kan. 384, 399, 362 P.3d 566 (2015). To prove the corpus delicti of a crime, the State must show "the existence of an injury" and "that this injury resulted from criminal activity." 303 Kan. at 399. Requiring the State to show the corpus delicti of a crime to sustain a conviction serves three purposes: (1) protecting against convicting defendants of crimes that did not occur; (2) protecting against reliance on false confessions; and (3) encouraging more thorough police investigations by ensuring they extend beyond an accused's confession. 303 Kan. at 401. Under the traditional, "formal corpus delicti rule," whether the State established the corpus delicti of a crime is determined by looking only at evidence other than the accused's confession. See 303 Kan. at 401. But in *Dern*, the Kansas Supreme Court noted the evolution of the corpus delicti rule, the problems in applying the formal corpus delicti rule to cases involving crimes that do not produce tangible injuries easily proven by physical evidence, and other jurisdictions' attempts at creating "workarounds" to the rule. 303 Kan. at 400-06.

One such "workaround" was the United States Supreme Court's "trustworthiness standard," which held that for federal law purposes, the government may use the accused's statements to establish the corpus delicti of the alleged crime as long as there is evidence that "'tend[s] to establish the trustworthiness of the [accused's] statement.'" 303

Kan. at 406 (quoting *Opper v. United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 [1954]). After noting that Kansas has long been using such methods, the Kansas Supreme Court held in *Dern* that the State may show the corpus delicti of a crime that "did not produce a tangible injury" or crimes which "do not naturally or obviously produce a tangible injury easily susceptible to physical proof" through "a trustworthy confession or admission." 303 Kan. at 410. It explained:

> "[W]hile the formal corpus delicti rule focuses on whether there is sufficient evidence of the body of the crime, rigidly severing a confession from the calculus, the trustworthiness standard looks to the totality of the circumstances to assess both whether the crime occurred and whether the confession was trustworthy—*i.e.*, reliable. Applying this standard, a reliable confession is itself sufficient evidence to establish the corpus delicti of the alleged offense." 303 Kan. at 407.

Put another way, if a confession is trustworthy, it alone can establish the corpus delicti of a crime.

> "A determination of trustworthiness will depend on the totality of the circumstances and may include a consideration of the following nonexclusive factors or indicia of reliability: (1) independent corroboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and (6) if the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length.
> "The evidentiary standard for finding a confession or admission sufficiently trustworthy to satisfy the State's obligation to present a prima facie showing of the corpus delicti is akin to the standard of review applicable to sufficiency of the evidence claims—

*i.e.*, it asks whether, viewed in the light most favorable to the prosecution, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged crime actually occurred. It must be noted that the State carries a higher burden when establishing the corpus delicti through a trustworthy confession than it otherwise would if establishing the corpus delicti through the traditional means of evidence entirely independent of the defendant's statements. [Citation omitted.]" 303 Kan. at 410-11.

*Independent corroboration of details or specific facts in the confession*

Purdy asserts that the State did not present any independent evidence to corroborate the details or specific facts of Purdy's confession. A.L. did not testify, Mother did not testify, Grandfather did not testify, and there was no physical evidence of the crimes. But as the State points out, Montague testified at trial—with no objection from Purdy—that A.L. had complained that Purdy inserted something into her vagina. Because there was no contemporaneous objection to this evidence, its admissibility is not properly before this court. See K.S.A. 60-404. Thus, the State presented some evidence at trial that independently corroborated the details or specific facts in Purdy's confession.

*The number of times Purdy confessed and the consistency between his confessions*

The State contends that Purdy made four confessions on October 20, 2016: one to Bridges during the post-polygraph interview, one to Montague during the post-polygraph interview, one unrecorded confession when Purdy told Montague at the jail that "it was not an accident, it was out of curiosity," and one to Montague when Purdy returned to the interview room after his arrest. On the other hand, Purdy characterizes the events of that day as being "inculpatory statements [that] took place in two different encounters close in time." In any case, whether this court considers Purdy's statements as four confessions or two, all the confessions occurred on the same day and all included a confession that while

22

bathing A.L., Purdy inserted the middle finger of his right hand into her vagina up to the first knuckle and left it there for a few seconds.

*The circumstances of the confession, including the identity of the person or persons to whom the confession was made and Purdy's state of mind at the time of the confession*

Purdy argues that the following circumstances undermined the trustworthiness of his confession: his worry about the loss of his family and potential incarceration, Bridges' statements that he could "work with" and get treatment for an individual who admitted his behavior, and Bridges' general refusal to accept his denials. But for the same reasons detailed in the previous issue on the voluntariness of Purdy's confessions, the record on appeal does not support a conclusion that Purdy's state of mind renders his statements untrustworthy. This is especially true with respect to Purdy's final confession to Montague. After Purdy's arrest, he asked to speak to Montague again and, when Montague went to the jail, Purdy told Montague that it was "not an accident, it was out of curiosity." Montague took Purdy back to the interview room and Purdy said:

> "A month ago, while I was giving [A.L.] a bath, I had, out of curiosity, put the tip of my middle finger in her vagina. About five seconds after that, my brain clicked on and I realized that it was wrong. I instantly took my finger out and I made sure she put clothes on and put her to bed. And I made sure after that to never put myself in that situation again um to which where if I happened to be the one to give her a bath, all I did was wash her hair."

Purdy also explained that he had convinced himself that inserting his finger into A.L.'s vagina was an accident. Purdy showed no outward signs of distress while giving this statement nor did he give any indication that his state of mind was causing him to make a false confession.

23

*The availability of the details in the confession from sources outside Purdy's personal knowledge*

As the State concedes, "Purdy's confession did not contain facts of details from outside his personal knowledge."

*Purdy's age, education, experience, and mental health, and the overall fairness of the exchange that included the confession, including whether there was deception, trickery, undue pressure, or excessive length*

For the final two indicia of reliability, Purdy largely reiterates the arguments he made in his voluntariness argument above, including his argument about Montague's direction that he not take his prescribed psychotropic medication before the interview and his argument that Bridges used known coercive methods to manipulate him into confessing. The State, on the other hand, asserts that Purdy never appeared overwhelmed or confused and that the interview was fair, not excessively long, and did not include undue pressure. As detailed in the last issue assessing the voluntariness of Purdy's statements, Purdy's interactions with Bridges and Montague were not unfair overall, they were not excessively long, and they did not include undue pressure or trickery.

*Totality of the circumstances*

To establish the corpus delicti of the crimes of rape and aggravated indecent liberties of a child, the State needed to make a prima facie showing that A.L. was injured as a result of criminal activity. See *Dern*, 303 Kan. at 399. An accused's statement can establish the corpus delicti of a crime as long as there is evidence that tends to establish the trustworthiness of the statement. 303 Kan. at 406. Under the totality of the circumstances, we conclude the evidence was sufficient to show the trustworthiness of Purdy's confession that he inserted his finger into A.L.'s vagina, and his confession established the corpus delicti of the charged crimes.

24

## Did the District Court Err By Admitting Hearsay Testimony?

Purdy next claims the district court erred by allowing Bridges to testify that he heard the allegation "that Mr. Purdy had put a crayon or crayons into the little girl's vagina." The district court allowed the testimony—over Purdy's hearsay objection—because it was not being offered for the truth of the matter asserted but to show why Bridges asked Purdy certain questions. But Purdy contends that the district court still should have excluded the evidence as irrelevant and because the testimony was ultimately admitted to show the truth of the matter asserted.

For its part, the State argues that it did not seek to introduce Bridges' testimony about A.L.'s allegations to prove the truth of those allegations, so Bridges' testimony was not hearsay. In addition, the State also argues that even if the admission of Bridges' testimony on this point was erroneous, any error was harmless because the State introduced evidence of A.L.'s allegations at other points in the trial and Purdy did not contemporaneously object each time. The State's final argument resolves this issue.

K.S.A. 2019 Supp. 60-261 provides:

> "Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

Under this standard, this court only reverses if a review of the entire record shows there is a reasonable probability that the error affected the outcome of the trial. See *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018). And where objected-to evidence "was cumulative of evidence that was otherwise admitted without objection," an

25

argument that the objected-to evidence was so prejudicial that it requires reversal must fail. See *State v. Jones*, 306 Kan. 948, 955, 398 P.3d 856 (2017).

During Bridges' direct examination, the prosecutor asked whether the allegation made against Purdy was "pretty specific as far as what had occurred with this child's genitalia." Bridges began to answer, and Purdy objected on hearsay grounds. The district court overruled the objection, and Bridges testified:  "The allegation I was made aware of was that Mr. Purdy had put a crayon or crayons into the little girl's vagina." Purdy is correct that his objection preserved the admission of Bridges' testimony for appellate review. See K.S.A. 60-404.

But what Purdy fails to acknowledge is that Montague also testified about these allegations. During direct examination, the prosecutor asked Montague why he went to search Purdy's home and Montague replied, "Um, originally there were some allegations of items that may have been inserted into [A.L.'s] vagina. And so I went out basically to take a look and see if those items were there." After testifying that Purdy consented to the search, the prosecutor asked Montague, "Ultimately, did you collect some crayons from the house?" and he replied, "I did." Purdy did not object during Montague's testimony.

As the State points out, State's Exhibit 1 also contains repeated references to the allegation that Purdy put a crayon into A.L.'s vagina. Purdy has not filed a reply brief, so he has not responded to this argument. And the record on appeal makes it impossible to determine with certainty which portions of State's Exhibit 1 the jury saw.

The prosecutor first sought to admit State's Exhibit 1 during Bridges' testimony and "publish for the jury roughly the last 20 minutes." State's Exhibit 1 is 3 hours, 12 minutes, and 13 seconds long. But the jury trial transcript contains a notation that states "a video was played for the jury from 1:04 p.m. until 1:21 p.m."—17 minutes. And the portion of the recording involving Bridges ends more than 20 minutes before the end of

26

the video itself—Bridges' last appearance on it is at the 2:42:26 mark. Perhaps the prosecutor meant that she wished to show "roughly the last 20 minutes" of Bridges' involvement in the interview, but the record is unclear.

Further confusing things, during Montague's later testimony, the prosecutor moved to show the jury "approximately 15 minutes of the remaining portion of the video that's already been admitted for the jury at this time" and, with the district court's permission, "a video was played for the jury from 1:34 p.m. until 1:52 p.m."—18 minutes. The prosecutor did not refer specifically to State's Exhibit 1, but it was the only video that the district court had thus far admitted into evidence. The context of Montague's trial testimony before and after the State played this video for the jury suggests that it was the recording of the interaction between Montague and Purdy after Purdy's interview with Bridges but before his arrest. That interaction between Montague and Purdy began at the 2:44:12 mark of the recording and lasted until the 3:01:10 mark. Perhaps this was the portion shown to the jury. Again, it is not clear from the record.

Finally, after the State rested and the district court denied Purdy's motion for mistrial, defense counsel asked the prosecutor, "[D]o you know the minute and time or the time it was that you started that video?" The prosecutor replied, "Two hours, 28 minutes and 28 seconds." Defense counsel stated, "Okay. I thought it was around there," and the prosecutor added, "Montague leaving the room at three hours, one minute, seven seconds." This appears to mean that the jury saw State's Exhibit 1 from the 2:28:28 mark to the 3:01:07 mark, but it is not clear.

"The burden is on the party making a claim of error to designate facts in the record to support that claim; without such a record, the claim of error fails." *State v. Miller*, 308 Kan. 1119, 1157, 427 P.3d 907 (2018). Purdy has failed to designate a record that shows whether the portions of State's Exhibit 1 the State showed to the jury included references to the allegation that Purdy put a crayon or other object into A.L.'s vagina. And the record

27

shows that Purdy did not make the contemporaneous and specific objection required to preserve the admission of State's Exhibit 1 for appellate review on hearsay grounds. When the State first sought to admit State's Exhibit 1 and publish part of it to the jury, Purdy objected: "I think we've already had a ruling on the admissibility of that. And I don't think that's a redacted copy." But this objection is not specific enough to find that Purdy objected *on hearsay grounds* to the admission of State's Exhibit 1.

In summary, the allegation that Purdy inserted a crayon or other object into A.L.'s vagina came into evidence, without the required specific and contemporaneous objection, through Montague's testimony and possibly through the publication of State's Exhibit 1. As a result, Bridges' testimony about that allegation cannot be the basis for reversal. See *Jones*, 306 Kan. at 955. Any prejudice caused by Bridges' testimony was cumulative to the prejudice caused by Montague's testimony and State's Exhibit 1.

### DID THE DISTRICT COURT ERR BY ADMITTING EVIDENCE THAT IMPROPERLY COMMENTED ON A.L.'S CREDIBILITY?

Purdy next claims the district court erred by allowing the jury to view portions of State's Exhibit 1 in which Bridges asked, "What do you think about [A.L.] because you know her mom and her grandparents and her dad, they're trying to figure out whether she is being truthful or a liar" and in which Bridges said, "People are going to wonder is she telling the truth or is she lying?" Purdy claims that the admission of State's Exhibit 1, which contained the full recording of the interrogation, violates the general prohibition against inviting one witness to comment on the credibility of another witness, as explained in *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005).

The State responds by arguing that Purdy did not preserve this issue for appellate review. It also contends that Purdy's argument fails on its merits because Bridges did not

28

comment on Purdy's credibility. Finally, the State argues that even if admission of the video were error, that error was harmless.

Purdy contends that he preserved this issue for appeal by "object[ing] to the contents of [the] video recording shown to the jury because it contained inappropriate comments regarding the credibility of witnesses and requested a mistrial." He asserts that because "[t]he district court overruled the motion and never instructed the jury regarding the video recording[,] . . . this issue is preserved for appeal." But the portion of the record on appeal to which Purdy cites in support is his motion for mistrial, which he made after the close of the State's case-in-chief.

As discussed above, under K.S.A. 60-404, Purdy needed to specifically and contemporaneously object at trial to the admission of evidence to preserve it for review. See *Richard*, 300 Kan. at 720-21. In other words, Purdy needed to object when the State offered State's Exhibit 1 into evidence, not after the close of the State's case-in-chief. Because Purdy has failed to provide a citation to the record showing that he contemporaneously and specifically objected to the admission of the video he now challenges, this issue can be considered waived. See *State v. Beltz*, 305 Kan. 773, 776-77, 388 P.3d 93 (2017) (finding an evidentiary claim waived when appellant failed to provide a citation to establish that he had met the contemporaneous objection requirement). And further review of the record shows that Purdy is raising arguments on appeal about State's Exhibit 1 that he did not raise in the district court.

Purdy filed a pretrial motion in limine seeking an order barring the State from introducing any evidence or testimony which would amount to an opinion of the credibility of the defendant or any other defense witness. He alleged that Bridges' statement during his interview "that the polygraph examination showed some indications of deception" was an impermissible implication that he was lying. At a hearing, without further argument, the district judge ruled: "I'll grant that motion because obviously that's

29

correct. And what we're talking about here is during the polygraph, and it was detailed in the brief, and, obviously, we—none of those will be expressed."

When the State moved for admission of State's Exhibit 1 at trial, Purdy objected:

"[THE PROSECUTOR]:  Your Honor, I would move to admit State's Exhibit 1, which is the audio/video version of the interview of Mr. Purdy. I would move to publish for the jury roughly the last 20 minutes.
"THE COURT:  Any objection?
"[DEFENSE COUNSEL]: I would object, Judge. I think we've already had a ruling on the admissibility of that. And I don't think that's a redacted copy.
"THE COURT:  All right. The Court will admit the portion that you choose to publish.
"[THE PROSECUTOR]:  Okay.
"THE COURT:  And if a redacted version is necessary, the State will provide it.
"[THE PROSECUTOR]:  Yes, Judge."

Assuming the reference to the pretrial ruling was specific enough, Purdy lodged a contemporaneous objection to the admission of State's Exhibit 1. But on appeal, Purdy does not argue that State's Exhibit 1 impermissibly commented on *his own credibility*, as he had in the district court. Instead, he argues that State's Exhibit 1 contains statements by Bridges that invited *Purdy* to comment on *A.L.*'s credibility. This is a different objection than the one Purdy raised in district court, and "appellate courts do not permit a party to object to evidence on one ground at trial and assert a different ground on appeal." *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018). Although we find that Purdy failed to preserve the claim he now makes on appeal, we will address the merits of the claim.

As Purdy and the State agree, a de novo standard of review applies because "[a] trial court has no discretion as to whether to allow a witness to express an opinion on the credibility of another witness; such evidence must be disallowed as a matter of law." See

30

*Elnicki*, 279 Kan. 47, Syl. ¶ 3. In *Elnicki*, the Kansas Supreme Court held that it was error to show the jury "a videotape in which a law enforcement officer comments on the defendant's credibility by calling the defendant a liar, by saying that the defendant was 'bullshitting' him and 'weaving a web of lies,' and by suggesting that he could tell the defendant was lying because the defendant's eyes shifted." 279 Kan. 47, Syl. ¶ 4.

Purdy argues that Bridges' comments in State's Exhibit 1 rendered it inadmissible under *Elnicki*. But as already explained, the record on appeal makes it impossible to determine with certainty which portions of State's Exhibit 1 the jury saw. And "[t]he burden is on the party making a claim of error to designate facts in the record to support that claim; without such a record, the claim of error fails." *Miller*, 308 Kan. at 1157. The record on appeal does not reflect that the State actually showed the jury the statements of which Purdy complains. Thus, this court could affirm based on failure to designate a sufficient record on appeal. See *State v. Coryell*, No. 110,542, 2016 WL 757568, at *24-25 (Kan. App. 2016) (unpublished opinion) (rejecting argument that trial counsel was ineffective for failing to redact a recorded interview shown to the jury where the trial exhibits were not in the record on appeal and the recording had not been transcribed and holding that the appellant "failed to establish the factual premise of his argument"). Even if this court ignores the ambiguity of the appellate record, Purdy's argument fails.

Purdy points to only one exchange with Bridges in his appellate brief, and the State does not contest that the jury saw this exchange.

> "[Bridges:] *What do you think* [A.L.]—*what do you think about her? Because right now, you know, her mom and her grandparents and her dad, they're trying to figure out whether she was being truthful or if she's a liar, you know what I'm saying*?
> "[Purdy:] I know.
> "[Bridges:] And, and, and for little kids growing up, you know, it's, it's pretty, uh, pretty important to, uh, have, uh, have people in their lives know that they are trustworthy, know that they love them—

31

"[Purdy:]  I—I love that little girl to death.

"[Bridges:]  —and, you know, when—

"[Purdy:]  And before, I would, I would blow my brains out before I did anything to hurt that child.

"[Bridges:]  So when—when she—'cause I mean people are going to wonder, okay, *is she telling the truth or is she lying*, you know, and so when she says that, you know, 'James put something into my vagina,' I mean, I mean, that's—that's going to be kinda—

"[Purdy:]  She's also—she's also said a couple times that I didn't do it and that she was just saying that.

"[Bridges:]  Mm-hmm. But, but that's not the truth though, right? You actually did put your finger in there and you left it for about five or six seconds, right? I mean, she was telling the truth. Is that correct?

"[Purdy:]  It did, it did happen. [inaudible] It was an accident."

Purdy contends that the italicized questions were improper under *Elnicki*. But as the State points out, the error in *Elnicki* occurred when the jury saw video of the detective himself commenting on the defendant's credibility. See *Elnicki*, 279 Kan. at 51-52, 57. In contrast, although Bridges asked Purdy for his opinions on A.L.'s credibility, Bridges himself did not comment on Purdy's credibility. The only time that Bridges spoke directly to A.L.'s credibility was when he asked Purdy to reaffirm his earlier admission that Purdy had inserted his finger into A.L.'s vagina.

Other panels of this court have distinguished statements such as Bridges' from the erroneous statements in *Elnicki*. In *State v. Araujo-Gutierrez*, No. 110,684, 2014 WL 6676127, at *2-3 (Kan. App. 2014) (unpublished opinion), this court examined whether the district court erred under *Elnicki* by refusing to order redaction of the following questions and statements by law enforcement from an audio recording of the defendant's police interrogation:

32

- asking the defendant "'[w]hy would [the victim] say something like that if it wasn't true? . . . Why would she make up a story like that if it's made up? . . . Do you know any reason why she would say something that was untrue about you?'"

- advising the defendant that "'it'd be good to be truthful now'" and "'it just looks better on your part to be truthful'" and otherwise stressing that it was important to tell the truth

- asking the defendant, "'Has she ever been a liar that you know of? Does this girl tell the truth usually? Has she been somebody that's deceitful?'"

- asking the defendant, "'Is she lying? Or are you lying? That's where I'm at now. She says it happened, you said it didn't. There's only one truth there right? . . . And my job is to find out who's telling the truth.'"

The *Araujo-Gutierrez* panel noted that unlike *Elnicki*, the comments before them were "not direct comments on [the defendant's] lack of credibility, nor are they direct expressions of personal opinions about [the victim's] credibility. They contain none of the repeated personal invective or name calling noted by the court in *Elnicki*." *Araujo-Gutierrez*, 2014 WL 6676127, at *5. Accordingly, the panel held that "*Elnicki* does not support [the defendant's] contention that the district court erred in refusing his request to have these comments redacted from the recording of the interrogation." *Araujo-Gutierrez*, 2014 WL 6676127, at *5.

Likewise, as the *Araujo-Gutierrez* panel noted, another panel of this court held similarly in *State v. Swann*, No. 102,023, 2011 WL 1344728, at *18-20 (Kan. App. 2011) (unpublished opinion). In *Swann*, this court found no error in showing the jury a video recording of the defendant's interrogation that contained "admonitions by the officers that [the defendant] should be honest with them," a detective asking if the defendant "believes it was likely that all four of the other participants [in the crime] made up a story," and

33

even an officer responding "Oh Bullshit" to the defendant's assertion that he had no knowledge that the crime would be committed. 2011 WL 1344728, at *19-20.

Bridges' statements here are much more like those in *Araujo-Gutierrez* and *Swann* than to those in *Elnicki*. As noted above, the sole portion of the video to which Purdy directs this court did not include statements by Bridges that directly commented on Purdy's credibility or that involved the sort of personal invective at issue in *Elnicki*. Although Purdy argues in his appellate brief that "[t]his exchange between Agent Bridges and Mr. Purdy is simply an example of the agent asking Mr. Purdy to comment on A.L.'s credibility," it is not this court's role to comb the rest of the interview and attempt to determine which other portions Purdy finds objectionable.

Even setting aside the preservation issue and the failure to designate a record sufficient for thorough appellate review, the only statements Purdy specifically identifies as allegedly violating the rule set forth in *Elnicki* do not do so. Thus, Purdy's claim on appeal on this issue fails. And finally, even if we found that the district court erred by admitting video evidence in which law enforcement asked Purdy to comment on A.L.'s credibility, we would find the error to be harmless because the entire record shows there is no reasonable probability that the error affected the outcome of the trial. See K.S.A. 2019 Supp. 60-261; *Lowery*, 308 Kan. at 1235.

DID THE DISTRICT COURT ERR BY GIVING LEGALLY ERRONEOUS JURY INSTRUCTIONS?

Purdy next claims the district court erred in instructing the jury on the required mental culpability to commit the crime of aggravated indecent liberties with a child. More specifically, Purdy claims the district court erred by giving jury Instruction No. 5, which instructed the jury that Purdy could have committed aggravated indecent liberties with a child intentionally, or knowingly, or recklessly. The State argues that any error in

34

the jury instruction on the culpable mental state to commit aggravated indecent liberties with a child does not amount to clear error.

First, we observe that this claimed instruction error does not affect Purdy's rape conviction. To review alleged error in a jury instruction,

> "'[w]e must first decide whether the issue has been preserved. Second, we analyze whether an error occurred. This requires a determination of whether the instruction was legally and factually appropriate. We exercise unlimited review of those questions. Next, if we find error, we conduct a "reversibility inquiry."' [Citations omitted.]" *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019).

As Purdy concedes, he did not object to the jury instruction in the district court, so this court reviews for clear error. See *Gentry*, 310 Kan. at 720-21. As Purdy and the State agree, the district court erred by instructing the jury that Purdy could knowingly or recklessly commit aggravated indecent liberties with a child. Aggravated indecent liberties is "lewd fondling or touching of the person of either the child [who is under 14 years of age] or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 2019 Supp. 21-5506(b)(3)(A). But in jury Instruction No. 5, which purported to explain the required mental states for the crimes charged, the district court instructed the jury that "[t]he State must prove that the defendant committed" aggravated indecent liberties with a child "[i]ntentionally, or [k]nowingly, or [r]ecklessly," and defined each of the three terms. The instruction as given misstated the mental state that the State needed to prove in order to prove Purdy committed the crime of aggravated indecent liberties with a child.

Thus, the question is reversibility. Under the clear error standard, this court considers the entire record de novo to determine "whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Gentry*, 310 Kan. at 721. Purdy asks this court to apply the constitutional harmless error

35

standard, under which the party benefitting from an error must prove beyond a reasonable doubt that the error did not affect the outcome of the trial. But the Kansas Supreme Court has held that even when an erroneous jury instruction may affect constitutional rights, Kansas appellate courts review for clear error if the defendant did not object to the instruction in the district court. See *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016). And "[t]he burden to establish clear error is on the defendant." *Gentry*, 310 Kan. at 721. Thus, to obtain a reversal of his conviction, Purdy must firmly convince this court that the jury would have reached a different verdict had it known that the State had to prove that Purdy intentionally committed aggravated indecent liberties with a child and did not have the option to prove that he did so knowingly or recklessly.

Purdy asserts that "[t]he primary contested issue in this case was [his] culpable mental state" because "[h]e did not contest giving A.L. a bath and touching her genital area." He contends that if properly instructed, "the jury could have easily formed a reasonable doubt regarding [his] intent" and whether he "inserted his finger in A.L.'s vagina . . . for the purpose of arousal or satisfaction for sexual desires." This oversimplifies Purdy's argument, for he testified at trial that he had not, in fact, inserted his finger into A.L.'s vagina.

In any event, when reviewing a claim that erroneous jury instructions require reversal, "'an appellate court is required to consider all the instructions together, read as a whole, and not to isolate any one instruction.'" See *State v. Sisson*, 302 Kan. 123, 130, 351 P.3d 1235 (2015). Kansas courts presume that juries follow instructions. See 302 Kan. at 131. As the State points out, the district court also gave the jury an elements instruction on the crime of aggravated indecent liberties with a child. That instruction informed the jury that the State needed to prove, among the other elements, that Purdy "engaged in lewd fondling or touching of" A.L. and that he "intended to arouse or satisfy the sexual desires of" A.L. or himself. Moreover, in her closing argument, the prosecutor referred to the elements instruction by number, telling the jury "you would need to find

36

that Mr. Purdy touched or fondled [A.L.] in a way that a reasonable person would consider to be lewd or offensive and that he did so with intent to arouse his sexual desires."

Although jury Instruction No. 5 incorrectly informed the jury that the State could prove Purdy had committed aggravated indecent liberties with a child intentionally or knowingly or recklessly, the elements instruction and the prosecutor herself informed the jury of the legally correct mental state required. Under these circumstances, we are not firmly convinced that the jury would have reached a different verdict on the aggravated indecent liberties charge had the district court not given the erroneous instruction.

DID THE PROSECUTOR COMMIT REVERSIBLE PROSECUTORIAL ERROR?

Purdy next claims the prosecutor committed reversible prosecutorial error during closing argument by arguing facts not in evidence. The State asserts there was no prosecutorial error. During closing argument, the prosecutor said:

> "What exactly happened and how much it happened or how often it happened, we will never know for sure because [A.L.] was only three years old when this happened. However, we do know that whatever happened made her tell somebody that it happened at three and a half years old. At three and a half years old she understood that what had happened was not right and she ended up telling somebody. We do know that. We do know that Theodore Purdy was brought in voluntarily on several occasions to talk about what happened. And you saw it on video that he corroborated what [A.L.] had said, that he had inserted something into her vagina."

Purdy argues that by this statement the prosecutor argued facts not in evidence and, by doing so, committed reversible error. He asserts that A.L. had not testified and "no substantive evidence related to 'what [A.L.] said' was in evidence." The State disagrees, arguing that evidence of A.L.'s allegations was properly admitted for the jury's

consideration through Montague's testimony, to which Purdy did not object. In the alternative, the State argues that even if the prosecutor erred, any error was harmless.

As Purdy notes, his failure to object contemporaneously to the prosecutor's statement does not make this issue unpreserved for appellate review. See *State v. Hirsh*, 310 Kan. 321, 342, 446 P.3d 472 (2019) ("The defense need not object in order to preserve [a prosecutorial error] issue for appeal.").

> "In considering a claim of prosecutorial error, we follow a two-step analysis. We first determine whether an error occurred. Second, if an error has been found, we evaluate the prejudice it caused to determine whether it was harmless. At the first step, error occurs if the appellate court determines the prosecutor's actions or statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' A criminal defendant establishes the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences with no evidentiary foundation. [Citations omitted.]" *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019).

"When a prosecutor argues facts outside the evidence, the first prong of the prosecutorial error test is met." *State v. Wilson*, 309 Kan. 67, 78, 431 P.3d 841 (2018). Purdy accurately notes that at trial, when Bridges began to testify about A.L.'s specific allegation, Purdy objected on hearsay grounds. The prosecutor argued that the testimony "goes to the reason for his investigation as well as the reason that he asked Mr. Purdy certain questions," and the district judge overruled the objection and allowed the testimony. Bridges then testified, "The allegation I was made aware of [was] that Mr. Purdy had put a crayon or crayons into the little girl's vagina."

Purdy contends that because the district court had not allowed Bridges' testimony to show the truth of A.L.'s allegation, the prosecutor could not use it for substantive purposes in closing argument. And the State agrees that Bridges' testimony was not

presented for the truth of A.L.'s allegation. But as the State argues, Montague also testified about A.L.'s allegation that Purdy had inserted something into her vagina. The prosecutor asked Montague if he had spoken with Purdy about the allegations and, when Montague answered affirmatively, the prosecutor continued, "And one of the specific details is that [A.L.] was complaining that he had inserted something into her vagina. Is that correct?" Montague replied, "That's correct."

Although the district court might have granted a hearsay objection to this testimony, Purdy did not make that objection, so whether that testimony was admissible is not properly before this court. See *Lowery*, 308 Kan. at 1195 ("[D]efendants cannot circumvent the contemporaneous objection requirements of K.S.A. 60-404 by characterizing the appellate issue as prosecutorial error, rather than an evidentiary error."). Through Montague's testimony, the State presented evidence that A.L. alleged that Purdy had inserted something into her vagina. Thus, the prosecutor's reference to that allegation did not argue facts outside the evidence and Purdy's claim to the contrary fails. Because Purdy fails to show that the prosecutor erred by arguing facts not in evidence, we need not address the second prong to determine whether the error was harmless.

DID CUMULATIVE ERROR DENY PURDY A FAIR TRIAL?

Finally, Purdy claims that even if none of the individual errors he asserts were enough to warrant reversal of his convictions, the cumulative effect of those errors require it. Conversely, the State argues that Purdy was not denied his right to a fair trial by cumulative error.

The test is whether the totality of the circumstances establish that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as

39

they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

Here, we concluded that Purdy was not prejudiced by the admission of hearsay evidence through Bridges' testimony because the same evidence was admitted through Montague's testimony and through State's Exhibit 1, and so any error was harmless. We also found that Purdy failed to preserve his claim that the district court erred by admitting video evidence in which law enforcement asked Purdy to comment on A.L.'s credibility, but we also added that any error in the admission of this evidence was harmless. Finally, we found that the district court gave a legally inappropriate instruction on the mental culpability to commit aggravated indecent liberties with a child, but there was no clear error that required reversal of that conviction. Even if we consider the cumulative effect of these potential errors in the context of the entire record, we conclude that Purdy fails to establish that he was substantially prejudiced and denied a fair trial.

Affirmed.